**FILED**

MAR 25 2013

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERALD CLINTON (J.C.) EAGLESMITH and EILEEN COX, <br><br> Plaintiffs, <br><br> v. <br><br> JEFF RAY, as an individual, SUE SEGURA, as an individual, and BOARD OF TRUSTEES OF PLUMAS COUNTY OFFICE OF EDUCATION/ PLUMAS COUNTY UNIFIED SCHOOL DISTRICT, <br><br> Defendants. | Case No.S:11-CV-00098 JAM-JFM <br><br> **PRETRIAL CONFERENCE ORDER** |

Pursuant to court order, a Pretrial Conference was held on March 22, 2013 before Judge John Mendez. Dan Siegel and Peter Haberfeld appeared as counsel for plaintiffs; Kathleen Darmagnac and Brian Duus appeared as counsel for defendants. After hearing, the court makes the following findings and orders:

## I.   JURISDICTION/VENUE

Jurisdiction is predicated upon 28 U.S.C. § 1332(a)(1), and has previously been found to be proper by order of this court, as has venue. Those orders are confirmed.

II.   JURY/NON-JURY

Both parties have demanded a jury trial.

III.   STATEMENT TO BE READ TO JURY

Seven (7) days prior to trial the parties shall E-file a joint statement of the case that may be read to the jury at the beginning of jury selection.

IV.   UNDISPUTED FACTS

Undisputed Facts - Plaintiff J.C. Eaglesmith:

1.   Plaintiff Jerald Clinton (J.C.) Eaglesmith (hereinafter "Eaglesmith") has been continuously employed by the District from 2000 to present as a teacher.  He served at Plumas County Community School until June 2012 when he was transferred at his request to teach an opportunity class at Greenville Junior/Senior High School ("Greenville").

2.   Eaglesmith was hired by the District as the head basketball coach at Quincy High School ("QHS") for the 2007/2008 season. He resigned in September 2007.

3.   During the 2004-2007 timeframe, Eaglesmith made numerous written complaints to QHS administrators about volunteer junior varsity coach Howard Hughes and his refusal to follow Eaglesmith's instruction and direction.

4.   The DFEH issued its findings by letter dated August 15, 2008, finding insufficient evidence to support Eaglesmith's claims of discrimination and harassment.  The DFEH also found that Ray never served as Eaglesmith's supervisor.  The letter also informed Eaglesmith that he had the right-to-sue within 180 days. Eaglesmith never brought suit.

5.   Eaglesmith was hired and served as the head basketball

1  coach at Greenville for the 2007/2008 and 2008/2009 seasons.

2       6.    Eaglesmith was rehired as the head basketball coach at

3  QHS for the 2009/2010 season and served the entire season.

4       7.    The District hired Defendant Sue Segura as the new

5  principal of QHS in June or July, 2009.  She had no previous

6  employment or association with the District and was relocating

7  from Nevada.

8       8.    Beginning in 2009/2010, Jeff Ray served as the vice

9  principal at QHS while he also remained a part-time physical

10 education teacher.  He was also appointed QHS athletic director

11 beginning in the school year 2009/2010.

12      9.    On December 28, 2009, Eaglesmith transported five

13 students in his private vehicle from QHS to the Bay Area to

14 participate in a basketball game.  It is an approximately 4 1/2

15 hour one-way trip.

16      10.    There were insufficient seatbelts in Eaglesmith's

17 vehicle for the students; there were only four seatbelts for the

18 five students.

19      11.    Eaglesmith claims that he did not discover the presence

20 of one of the students and the insufficient seatbelts until

21 approximately 2 hours outside of QHS.  He continued the trip

22 despite the lack of seatbelts and instructed the two smallest

23 students to share a seat belt.

24      12.    Ron Collins, a parent of one of the students in

25 Eaglesmith's vehicle, filed a written complaint to the District

26 complaining that his son was transported by Eaglesmith in a

27 vehicle that did not have enough seat belts for all the

28 passengers.

1     13.  As a result, Eaglesmith received an unsatisfactory
2 coaching evaluation for the 2009/2010 season.  Eaglesmith grieved
3 the evaluation and the grievance was denied.

4     14.  Eaglesmith applied for the head basketball coach
5 position for the 2010/2011 season.

6     15.  Segura and Ray interviewed Eaglesmith and two other
7 applicants Mike Woodlee and Dennis Fowler for the head coach
8 position.  Woodlee was hired.

9     16.  Woodlee received an unsatisfactory coaching evaluation
10 for the 2010/2011 season and was not rehired as head coach at QHS
11 the following year.

12     17.  On November 3, 2010, Deputy Superintendent Yvonne Bales
13 who works at the District office, parked a pickup truck that
14 displayed hand-painted slogans, bumper stickers, and a rope in the
15 shape of a noose hanging from the rearview mirror in the District
16 parking lot outside of her office.  The truck belonged to her
17 husband Nathan Bales who is not an employee of the District.

18     18.  Eaglesmith saw the truck and complained to the District.
19 Union representative Piers Strailey also filed a complaint about
20 the truck.

21     19.  On November 15, 2010, former Superintendent Glenn Harris
22 wrote a public letter to the Plumas News reporting the outcome of
23 the District's investigation and the ban of the truck from
24 District premises.

25     20.  Beginning on December 9, 2010 through the end of the
26 school year 2010/2011, Eaglesmith took a leave of absence from the
27 District citing on-the-job stress.

28     21.  Eaglesmith holds a single subject teaching credential in

1 | physical education.

2 |     22.   Eaglesmith requested a transfer to Greenville in 2012 to

3 | an opportunity class teacher position.

4 |     Undisputed Facts - Plaintiff Eileen Cox:

5 |     1.   Cox claims that she was discriminated and retaliated

6 | against by the District for her association with and support of

7 | J.C. Eaglesmith.  She has no claims against the individual

8 | Defendants Segura or Ray.

9 |     2.   Cox has been an employee of the District from 1979 to

10 | the present.

11 |     3.   In 2009/2010 through 2010/2011, Cox worked at QHS.

12 |     4.   Cox contends Segura knew during the 2009/2010 school

13 | year that Cox associated with and supported J.C. Eaglesmith.

14 |     5.   On or about January 25, 2010, Segura evaluated Cox and

15 | rated her above average or excellent in all categories.

16 |                   V.   DISPUTED FACTUAL ISSUES

17 |     Plaintiffs' Disputed Facts - Plaintiff J.C. Eaglesmith:

18 |     1.   Plaintiff J.C. Eaglesmith is a Native American of

19 | Shawnee/Muskokee-Creek and French/Swiss descent.

20 |     2.   Defendant Sue Segura began to exercise her

21 | responsibilities as the Principal at Quincy High School (QHS) in

22 | June 2009.

23 |     3.   Defendant District hired Eaglesmith to serve as Head Coach

24 | of the boys basketball program at QHS for the 2007-2008 school

25 | year.

26 |     4.   During the years 2004-2007 that Eaglesmith was Head Coach

27 | of the QHS basketball program, he complained about the conduct of

28 | Howard Hughes, a member of the community who the QHS administration

5

1 | selected each year as his volunteer assistant coach to coach the
2 | Junior Varsity (JV) team.  He complained to QHS principal Gallagher
3 | and athletic directors Ray and Robin Hood about Hughes' separate
4 | fundraising activities, unilaterally changing schedules and
5 | selecting assistant coaches, undermining the QHS boys basketball
6 | program by creating division between the Varsity and JV components,
7 | and refusing to accept the Head Coach's direction in violation of
8 | the District's athletic policy.

9 | 5.  On November 21, 2006, J.C. Eaglesmith, his wife Ramona,
10 | and their son Justus presented the Native American perspective
11 | about Thanksgiving at a school wide assembly at QHS.

12 | 6.  During the 2006-2007 basketball season, Coach Eaglesmith's
13 | wife Ramona coached a QHS Dance Team that performed during game
14 | half-times. Ms. Eaglesmith is a professional dance teacher, coach
15 | and choreographer.

16 | 7.  In 2007 and 2008, Coach Eaglesmith complained about Ray to
17 | Ray's superiors, the District School Board, the State Department of
18 | Fair Employment and Housing (DFEH) and the Federal Equal Employment
19 | Opportunity Commission (EEOC). He complained that Ray discriminated
20 | against him because of his national origin and spiritual beliefs,
21 | created a hostile working environment, and undermined his efforts
22 | to perform the duties of his Head Coach position.

23 | 8.  In March 2007, then Superintendent Chelotti and the School
24 | Board issued a District-wide policy that required that henceforth
25 | the AD was to be an administrator. Part-time teacher Ray was
26 | discharged from the QHS AD position before the end of the 2006-2007
27 | basketball season.

28 | 9.  In August 2007, Jerry Thomas, QHS Vice-Principal

6

1 criticized Eaglesmith for filing discrimination complaints against
2 Ray and charged that they lacked merit.

3     10. The QHS administration selected Howard Hughes as volunteer
4 assistant coach in charge of the JV team for the 2007-2008.
5 Eaglesmith resigned his 2007-2008 QHS Head Coach position in
6 September 2007.

7     11. District site administrators issued positive performance
8 evaluations to Mr. Eaglesmith for his coaching from the 2004-2005
9 through the 2008-2009 school years.

10     12. Coach Eaglesmith's son Justus was the ball boy during
11 each period Eaglesmith served as QHS Head Coach.

12     13. Before the 2009-2010 basketball season began, QHS
13 administration issued Eaglesmith a key to the inner office of the
14 QHS gymnasium and he placed personal items and coaching materials
15 in one of its tall lockers that coaches used to store their
16 belongings. Eaglesmith and other Head Coaches previously used the
17 inner office to change their clothes as well as used the desk,
18 telephone and the pneumatic ball pump to carry out their coaching
19 responsibilities.

20     14. On a date in July 2009, prior to July 21, 2009, defendant
21 Segura hired Ray as QHS AD. He was at the time and continued to be
22 a part-time physical education teacher and part-time Vice Principal
23 at QHS.

24     15. Head Coach Eaglesmith communicated to Ray and Segura that
25 he wanted to be involved in the selection process of the JV coach
26 of the boys basketball program at QHS for the 2009-2010 season.

27     16. In August 2009, QHS administrators Segura and Ray changed
28 the lock to the inner office of the QHS gymnasium. Eaglesmith's key

1  no longer enabled him to access the inner office.  They did not

2  give him access to the inner office until the later part of

3  February 2010, near the end of the 2009-2010 basketball season.

4  They refused his requests that he be allowed to retrieve his

5  belongings from his locker in the inner office

6      17.   On August 24, 2009, Eaglesmith, his PCTA representative

7  Piers Strailey, Segura and Ray met with Superintendent Glenn

8  Harris. Eaglesmith and Strailey reviewed for Segura and Harris the

9  history of charges Eaglesmith had made in the past against Ray.

10     18.   On September 21, 2009, defendant Segura announced that,

11 without Eaglesmith's involvement, she had selected Howard Hughes to

12 be the "Head Junior Varsity Coach" of the boys basketball program

13 at QHS. Neither Segura nor Ray interviewed other applicants.

14     19.   Segura told Head Coach Eaglesmith to store his belongings

15 and change his clothes in a closet that had been used by the head

16 custodian to store cleaning supplies that contained harmful

17 chemicals.  There was no ventilation or place to sit in the

18 chemical closet.

19     20.   After Eaglesmith declined to use the chemical closet to

20 store and change his clothes and equipment, Segura told him to use

21 an area in which she had placed a bar in front of a toilet.  The

22 toilet is located in a small room across from the inner office in

23 the QHS Gym.

24     21.   Segura instructed Eaglesmith that he was not to speak

25 with his assistant coach Hughes during JV practice sessions or

26 games.  She also barred Eaglesmith from requesting assistance from

27 Hughes during the opening tournament of the 2009-2010 season, a

28 tournament Eaglesmith was responsible for directing.

22.   Hughes communicated to Ray and Segura that he refused to accept direction from Head Coach Eaglesmith.

23.   Superintendent Harris directed Assistant Superintendent Williams to investigate the seat-belt incident.  Williams issued Eaglesmith a written warning on March 23, 2010, for driving six people with five seatbelts.  He directed Segura to use it as a basis for her formal evaluation of his coaching performance.

24.   The District interviewed two team members who had driven in Eaglesmith's car to inquire whether they had spoken with Eaglesmith about the incident.  Williams issued a second written warning to Eaglesmith, charging him with interfering with the investigation of Collins' complaint.

25.   PCTA representatives, on behalf of Eaglesmith, challenged Williams' disciplinary action.

26.   The "unsatisfactory" evaluation eliminated Eaglesmith's hiring preference as the incumbent coach.

27.   Superintendent Harris announced on May 5, 2010, to members of the School Board that Eaglesmith would not be chosen as the Head Coach for 2010 because of the seat belt incident.

28.   On May 20, 2010, Eaglesmith submitted an application to the District for the position of Head Coach of the QHS boys basketball program.  The deadline at the time was the following day, May 21, 2010.

29.   On or about May 25, 2010, District Administrator Willits publicly admonished Justus Eaglesmith at the Taylorsville Elementary School he attended for having his left instead of right hand on his heart during the pledge of allegiance.  Justus was one of the few Native American children enrolled at the school and was

9

1  deeply humiliated.

2      30.  Eaglesmith had coached at the high school and college

3  levels for 30 years, played semi-pro basketball, and was evaluated

4  positively throughout his years of coaching.  Woodlee's experience

5  consisted of having been the coach of the Truckee High School

6  freshman basketball team in 2009-2010.

7      31.  Defendant Segura explained that they rejected Eaglesmith

8  and selected Woodlee because he was "more qualified."  The QHS

9  administration selected Fowler as the coach of the JV team.

10      32.  On several occasions prior to October 11, 2010,

11  Eaglesmith and attorney Beth Curtis, who represented him, notified

12  Superintendent Harris that they would file a complaint at the

13  October 12, 2010 meeting of the District School Board about the

14  District's rejection of Eaglesmith for the position as Head Coach

15  of the QHS boys basketball team for the 2010-2011 year and

16  requested time on the agenda to make that presentation.  Harris

17  responded on October 1, 2010, that Eaglesmith would not be allowed

18  on the agenda.

19      33.  On October 11, 2010, District administration held a

20  training session for District teachers at QHS on a non-student day.

21  Segura urged administrator Willits to direct Eaglesmith to remove

22  his tinted prescription glasses and visor cap.

23      34.  Willits and Oestreich, a District administrator and

24  Eaglesmith's immediate supervisor approached him and told him to

25  take off his glasses and hat.  They claimed that Eaglesmith

26  violated a District rule by wearing those items.

27      35.  On October 12, 2010, Eaglesmith, his attorney and

28  supporters attended the October meeting of the District School

1   Board.  His attorney read the content of a complaint she had

2   prepared that detailed the previous treatment of Eaglesmith and

3   alleged that it discriminated and retaliated against him based on

4   his national heritage and spiritual tradition as well as his

5   opposition to District's employment practices that violated State

6   and Federal employment laws.

7       36.  Eaglesmith explained to Oestreich at the time she ordered

8   him to remove his prescription glasses and visor cap that he has a

9   medical need to shade his eyes from the glare of natural and

10  artificial light due to photosensitivity, a condition he suffered

11  from since he performed military service during the Vietnam War.

12  Oestreich requested that Eaglesmith provide the District with

13  written verification of his claim. He produced letters from a

14  medical doctor.  Oestreich said they were insufficient.

15      37.  On October 27 and December 3, 2010, Oestreich issued

16  disciplinary letters to Eaglesmith (a Warning of Unprofessional

17  Conduct and a Letter of Reprimand) claiming that he had not

18  substantiated his medical claim.  Williams wrote to Eaglesmith

19  requiring him to submit a letter from a doctor stating that his

20  visor cap shades his eyes and protects him from the glare.

21      38.  Eaglesmith filed grievances concerning the District's

22  order that he not wear the glasses or cap, and the discipline the

23  District issued to him. On December 15, 2010, approximately two

24  months later, and after Eaglesmith left on December 9, 2010 on

25  stress leave, the District allowed Eaglesmith to wear his tinted

26  lenses indoors.  On January 24, 2012, after approximately sixteen

27  months had passed and two arbitrators ruled that District

28  administrators had imposed discipline on Eaglesmith in violation of

1 | the District policy that prohibits discipline without "just cause,"

2 | the District allowed Eaglesmith to wear his visor cap indoors.

3 |     39.  Deputy Superintendent Yvonne Bales had attended, as a

4 | District representative, two meetings that were held in connection

5 | with the grievances filed by Mr. Eaglesmith and the discipline

6 | issued by Ms. Oestreich to him.  She wrote a memo disputing a claim

7 | he made during the meeting of October 10, 2010. Bales was also

8 | present as a District representative at the October 12, 2010

9 | meeting of the District School Board when the attorney for the PCTA

10 | read a tort claim she filed on behalf of Mr. Eaglesmith.

11 |     40.  Eaglesmith received a written warning from his

12 | supervisor Oestreich regarding the hat and glasses incident.

13 |     41.  On November 3, 2010; Deputy Superintendent Bales parked

14 | her pick-up truck in the parking lot of the District Administration

15 | building within sight of teacher Eaglesmith and students attending

16 | the Community School.  The pick-up displayed slogans that

17 | communicated White supremacist messages and had a rope in the shape

18 | of a noose hanging from the rear view mirror inside the truck. Many

19 | of the students attending the school are non-white.  Eaglesmith and

20 | some of the students read the messages on the truck.

21 |     42.  Eaglesmith and Piers Strailey filed complaints with the

22 | District on behalf of Eaglesmith, District employees and students

23 | claiming that the messages on Bales' pick-up were offensive and

24 | physically threatening, created a hostile work environment, and

25 | violated the District policy and State law against discrimination.

26 |     43.  The District's anti-discrimination policy is designed to

27 | protect employees and students from attacks on account of their

28 | race and other individual characteristics. The District did not

1   discipline Bales.  Nor did it interview Eaglesmith or Strailey.

2       44.   Eaglesmith requested a transfer to GHS in 2011 to teach

3   an opportunity class at GHS.  The District denied the transfer

4   request on two grounds: that he did not have a multiple subjects

5   credential and did not have a special education credential. In the

6   summer of 2012, the District transferred Eaglesmith to GHS to teach

7   the same opportunity class he applied to teach in 2011.  It also

8   assigned a special education student to his classroom.

9       45.   Ramona Eaglesmith is a member of a protected class by

10  reason of her Native American heritage and Native American

11  spiritual beliefs.

12      46.   During the period from 2005 through 2007, defendant Ray

13  expressed his disapproval to Eaglesmith about the latter's lack of

14  Christian belief in Jesus Christ and the Christian God; and his

15  traditional Native American spiritual beliefs and practices.  In

16  November 2006, Ray also expressed his disapproval of the Eaglesmith

17  family's presentation at a QHS assembly of the Native American

18  perspective of Thanksgiving. During the following few days Ray took

19  steps that had the affect of isolating Coach Eaglesmith from

20  basketball players, game officials, and the community.

21      47.   During the school years 1998-1999 through 2004-2005, Theo

22  Jackson, an African American, served as Head Coach of the QHS Girls

23  Basketball program.  During those years, the coaches of the Girls

24  JV Team followed the direction of Jackson and ran a unified

25  basketball program.  During the 2005-2006 year, the OHS

26  administration hired Shannon Coombs, who had never coached before,

27  as the JV Coach. Jeff Ray, during his first year as Athletic

28  Director, allowed her to refuse to follow Jackson's direction, to

1  run an independent program, and thereby to violate the District
2  policy requiring and authorizing the Head Coach to direct the
3  program.  Although the incumbent Head Coach, QHS administration
4  required Jackson to apply in 2006-2007, rejected him, and, instead,
5  hired a Caucasian applicant who had never been a Head Coach.

6      48.   In 2007, Assistant Superintendent Williams responded to
7  Eaglesmith's complaints about the way he was treated by District
8  administrators by explaining to Eaglesmith that he is "just a big
9  scary Indian."  He acknowledged, but did not do anything to address
10  the racial element in the treatment about which Eaglesmith was
11  complaining.

12      49.   The District in 2007-2008 refused to hire Randy Gilbert,
13  a Native American applicant for the position of JV Coach.  Head
14  Coach Eaglesmith had communicated to Ray and other administrative
15  decision makers his preference for Gilbert and opposition to
16  Hughes.

17      50.   District policy and past practice do not allow for the
18  selection of the JV Coach by District administrators without the
19  Head Coach's involvement and over his objection.

20      51.   On August 21, 2009, Segura told Eaglesmith's supervisor
21  Terry Oestreich that she should direct Eaglesmith to appear with
22  his representative at a meeting the following Monday, on August 24,
23  2009, to answer her accusation that he had entered an unauthorized
24  area and stolen items.  Oestreich conveyed that message to
25  Eaglesmith.  Segura and Ray accused Eaglesmith of stealing items
26  from the inner office at the QHS gym.  Staff members have the right
27  to be accompanied by their representative at disciplinary meetings.

28      52.   The toilet room is also used for storage. Students often

1   enter the adjoining room. The door cannot be secured or locked and
2   provides no privacy.  Segura and Ray did not direct any other coach
3   to use either the chemical closet or the toilet room.

4       53.  During the 2009-2010 QHS basketball season, Coach
5   Eaglesmith complained to Principal Segura and AD Ray that JV Coach
6   Hughes refused to follow his directions, unilaterally scheduled
7   practices and selected an assistant coach for the JV team,
8   undermined his ability to perform his duties as Head Coach, refused
9   to protect him and students under his supervision from the conduct
10  and speech of Hughes' friends and family members, and violated the
11  District policy that establishes the Head Coach as the director of
12  the athletic program.

13      54.  The District has a policy and practice that allows the
14  Head Coach's family members to circulate freely in the QHS gym.
15  During the 2009-2010 QHS basketball season, Segura and Ray barred
16  members of Eaglesmith's family, including Ramona Eaglesmith and son
17  Justus, the official ball boy, from several areas of the QHS Gym.

18      55.  The district has a policy and practice that terminates a
19  JV Coach who refuses to accept the direction of the Head Coach.
20  During the 2009-2010 basketball season, Ray and Segura did not
21  terminate Hughes from his position as a volunteer assistant coach
22  after they became aware that he refused to accept direction from
23  Head Coach Eaglesmith.

24      56.  During the 2009-2010 basketball season, J.C. Eaglesmith
25  advocated for his physical and emotional safety as well as that of
26  students under his supervision.  The complaints filed by J.C.
27  Eaglesmith and his PCTA representatives Faith and Piers Strailey,
28  as contract grievances and as formal complaints under District

regulations, charged District administrators, including Ray and Segura, with failing to protect: (a) Head Coach Eaglesmith from public verbal attacks by friends and relatives of JV Coach Hughes that included charges of incompetence; (b) the students under his supervision from publicly stated lewd sexual references, anti-gay names and racist epithets directed at them at basketball games by parents and a student who were friends of JV coach Hughes at basketball games; and (c) three team members and the special education student Varsity Team Manager from physical abuse that included nipple pinching by the son and grandson of the JV Coach Hughes.

57.    On February 13, 2010, Principal Segura, in the presence of Eaglesmith's close friend and colleague, referred to Eaglesmith as "J.C. Asshole Smith" thereby ridiculing his Native American name.  The colleague wrote-up the incident on February 26, 2010 and gave it to Eaglesmith. Eaglesmith gave the writing to Superintendent Harris a few days later.

58.    At the urging of Ray and Segura, on February 22, 2010, Ron Collins prepared a written complaint and took it to the District Office claiming that his son and another team member did not have seatbelts.

59.    Prior to March 23, 2010, Eaglesmith had never been found to have committed an infraction during his previous ten year employment with the District.  The District policy requires a verbal warning for a first-time infraction.

60.    District policy, particularly the PCTA-PUSD collective bargaining agreement, requires that performance evaluations of certificated employees be based on the personal observations of the

1  evaluator. Segura had not formally observed his coaching
2  performance during the season.  The collective bargaining agreement
3  also requires that the Principal evaluate the performance of
4  coaches at the end of the season.

5     61.  On October 11, 2011, Eaglesmith felt humiliated in front
6  of his colleagues by Willits' and Oestreich's conduct stripping him
7  of his prescription glasses and visor cap.

8     62.  No adult dress code existed on or prior to October 11,
9  2011.

10    63.  Eaglesmith satisfied requirements of the California
11 Education Code and the federal No Child Left Behind Act to be rated
12 "highly qualified" and therefore was eligible to teach in the
13 opportunity class position he applied for at Greenville in 2011.

14    64.  District administrators demonstrated their discriminatory
15 animus toward J.C. Eaglesmith by refusing to enforce District
16 policies and/or follow District practices on his behalf, but
17 enforcing and following them on behalf of similarly-situated
18 District employees.

19    65.  District administrators demonstrated their discriminatory
20 animus toward Eaglesmith by their refusal to explain their conduct,
21 inconsistent explanations of their conduct, and or explanations
22 that lack credibility.

23    66.  Eaglesmith engaged in protected activity by making
24 complaints that the District discriminated against him because of
25 his national ancestry and spiritual beliefs and practice, and
26 because he advocated compliance with laws prohibiting
27 discrimination, harassment and retaliation.

28    67.  The District treated Eaglesmith adversely when it

1  disciplined him, negatively evaluated his performance as the Head

2  Coach, and refused to hire him as Head Coach of the QHS Boys

3  Basketball Program for the 2010-2011 year.

4      68.   Eaglesmith's national origin, spiritual beliefs and

5  practices, and protected activity were a substantial motivating

6  factor for the adverse actions taken against Eaglesmith.

7      69.   Eaglesmith was harmed by losing wages, earnings,

8  benefits, and suffering humiliation, mental anguish and emotional

9  distress.

10     70.   The District's adverse actions, including the discipline

11  and negative evaluation it issued to him, and its refusal to hire

12  him as Head Coach for the 2020-2011 year was a substantial factor

13  in causing Eaglesmith's harm.

14     71.   The district owes Eaglesmith for lost wages and lost

15  benefits, for the period December 9, 2010 through the end of the

16  2010-2011 school year, and for the lost coach's stipend for the

17  2010-2011 year.

18     72.   The amount of unpaid wages to Eaglesmith is $45,404 for

19  the period December 9, 2010 - June 2011. His future economic loss

20  is $11,757.

21     73.   The District willfully failed to pay the wages owed to

22  Eaglesmith.

23     Plaintiffs' Disputed Facts - Plaintiff Eileen Cox:

24     1.   Cox had been assigned as an Instructional Aide to special

25  education teacher Piers Strailey, prior to his retirement in June

26  2011.  His classroom (Room 11) was her base of operations as she

27  performed duties as an aide assisting special education students in

28  other classrooms.

18

2.   Cox has at all times been the director of the only private dance studio in Quincy. It is known as the Footloose Dance Studio, offers dance instruction to people of all ages, and employs Ramona Eaglesmith, J.C. Eaglesmith's wife, as one of its instructors, coaches and choreographers.  Ramona Eaglesmith and Eileen Cox have taught dance to hundreds of students together. They also collaborated during the past few years in the production of numerous dance presentations at QHS and other public venues.

3.   At the beginning of the 2010-2011 school year, Eileen Cox had been employed by the District for thirty years. District administrators had issued to her consistently favorable performance evaluations during all those years.

4.   Eaglesmith presented letters of support to Superintendent Harris on January 25, 2010, in response to Segura's claim to his PCTA representatives in December 2009 that he had no support on the staff or in the community.

5.   On June 29, 2010, Segura barred Eileen Cox and the special education student to which she was assigned from the QHS campus.

6.   On July 1, 2010, Segura and Superintendent Harris confronted Cox in the QHS parking lot and demanded that she turn over her master keys.

7.   On August 22, 2010, a few days before the school year began for students, the QHS school secretary informed Cox that she would not be welcome at the in-service meeting for teachers.

8.   District policy requires that performance evaluations and the evaluation process for classified employees perform a remedial function.  Any negative evaluation shall include specific

1  recommendations for improvement and offer for assistance to the
2  employee.   The evaluation process is not to be used for punitive.

3      9.   On August 25, 2010, Segura alleged that there were
4  inadequacies in paperwork that Cox completed for her position as
5  QHS Vocational Specialist

6      10.   In August 2010, Segura unilaterally eliminated the
7  Sunshine Club, a project Cox had created.

8      11.   On September 2, 2010, Segura verbally reprimanded Cox
9  because she did not accompany her student continually while she
10  stood in line for nutrition break.

11      12.   On September 13, 2010, Segura disciplined Cox for
12  inviting the former coordinator of the Workability Program, a non-
13  District employee, into her classroom.   On the same date she
14  disciplined Cox for speaking with the parent of her 1-on-1 student.

15      13.   On October 29, 2010, Segura accused Cox of making
16  negative remarks about Segura out of her presence, in locations and
17  at times Segura refused to specify, and that the remarks were
18  described to Segura by witnesses she would not identify.   Segura's
19  accusations included an allegation that Cox made critical comments
20  about her off-campus during non-work hours.   Segura threatened her
21  with discipline unless she apologized for making the alleged
22  derogatory statements.   Although Segura refused to specify what she
23  was accusing Cox of having said, when, where and to whom, Cox
24  apologized, and at the same time denied ever having said anything
25  negative about Segura.

26      14.   On November 5, 2010, Piers Strailey helped Cox file a
27  District Complaint concerning Segura's threat of discipline unless
28  Cox apologized for allegedly making negative comments about her

1  during non-work hours at a non-work location.

2      15.   On November 8, 2010, Cox filed a District Complaint

3  complaining that District administrators, including Segura and Ray,

4  discriminated and retaliated against her and harassed her because

5  she communicated to them her support of J.C. Eaglesmith.

6      16.   On November 8, 2010, CSEA filed a grievance on Cox's

7  behalf alleging that Segura treated her with hostility because of

8  her association with J.C. Eaglesmith.

9      17.   On November 18, 2010, Cox filed another District

10  Complaint complaining that District administrators violated Board

11  policies and regulations that prohibit discrimination, retaliation

12  and harassment.

13      18.   On December 3, 2010, Cox received a letter from Segura,

14  dated December 2, 2010, stating that she will not support her

15  getting a job she sought at Pioneer Elementary School.

16      19.   On December 14, 2010, Cox resigned her vocational

17  specialist position, effective January 3, 2011.

18      20.   On January 10, 2011, Segura gave Cox a memo and form she

19  was to fill out at fifteen and thirty minute intervals and turn in

20  the following day.  She was to use the form to describe her

21  activities during those intervals.

22      21.   On January 10, 2011, Segura, Ray and one of the special

23  education teachers to whom she was assigned entered the classroom

24  to observe her performance.  As a consequence, at various times

25  there were from five to seven adults in the classroom of nine

26  special education students.

27      22.   On January 16, 2011, Cox filed a District Complaint

28  alleging that Segura's conduct violated District policies and

21

regulations against discrimination, harassment and retaliation.

23.   On January 19, 2011, Cox filed her third District Complaint alleging that Segura discriminated, created a hostile work environment, and retaliated against her.

24.   On January 24, 2011, Cox filed an Incident Report with District administrators complaining of the way Segura was treating her.

25.   On January 28, 2011, Segura issued to Cox a negative performance evaluation. Segura rated Cox as "Needs Improvement" in three categories and "Satisfactory" in three categories.  She gave Cox a general rating of "D:" "A fairly good employee who, although not yet demonstrating average or better performance, may be capable of such with added experience and proper guidance."

26.   On February 7, 2011, Cox filed an additional Incident Report with District administrators complaining of the way Segura was treating her.

27.   On February 14, 2011 Cox appealed the negative performance evaluation she received from Segura on January 28, 2011.

28.   On March 29, 2011, Cox filed an additional Incident Report with District administrators complaining of the way Segura was treating her.

29.   On April 21, 2011, Segura issued to Ms. Cox a negative performance evaluation for the 2010-2011 school year.  Segura rated Cox "Needs Improvement" in three categories and "Satisfactory" in three categories. Again Segura gave her a general rating of "D:" "A fairly good employee who, although not yet demonstrating average or better performance, may be capable of such with added experience

1 | and proper guidance."

2 |     30.   On August 9, 2011, Cox was granted a place on the agenda
3 | of the School Board during a regularly scheduled meeting.  he
4 | presented a detailed account of actions taken by Segura that she
5 | claim negatively affected her ability to carry out her duties.

6 |     31.   Eileen Cox is a member of a protected class by reason of
7 | her association with and support of J.C. Eaglesmith.

8 |     32.   Since the District first employed J.C. Eaglesmith in
9 | 2000, Eileen Cox associated with, assisted, and supported him in
10 | various ways that were known to administrators Ray and Segura. (a)
11 | She assisted him in his classroom at the Court School. (b) She
12 | assisted him as the Head Coach of the boys basketball program at
13 | QHS beginning in 2004. (c) She assisted him at the Tip Off Classics
14 | basketball tournament in December 2009 by using her keys to help
15 | him gain access to the QHS Gym and enable him to carry out his
16 | duties as director of the tournament. (d) She urged fellow faculty
17 | members to support Eaglesmith and the QHS Boys Basketball program.

18 |     33.   In December 2009, Ray and Segura questioned Cox why she
19 | assisted J.C. Eaglesmith and directed her not to assist or
20 | associate with him.   They questioned whether she used her key to
21 | assist Eaglesmith to enter the gym and/or the inner office. Cox
22 | communicated to Segura and Ray that she would continue to associate
23 | with, assist and support J.C. despite their attempts and statements
24 | to discourage her from doing so. She replied "Why not?"

25 |     34.   During the 2009-2010 and 2010-2011 years, Cox saved a
26 | seat for Eaglesmith and stood up to greet him when he arrived at
27 | District-wide and school meetings conducted by Ray and Segura.  She
28 | has made visible her support and her association with him by her

physical proximity to him at meetings of the District School Board
when he and the District's treatment of him were subjects of
controversy.

35.   During 2009-2010, Cox participated in conversations with
Eaglesmith and his union representative Piers Strailey, that took
place in Strailey's QHS classroom, to plan Eaglesmith's and PCTA's
challenge to what they reasonably believed were discriminatory and
retaliatory actions against him by District administrators. Segura
observed her at those meetings.

36.   In December 2009, Cox wrote a letter of support for
Eaglesmith that he had requested and gave it to him.

37.   Eileen Cox associated with, assisted and supported Ramona
Eaglesmith in various ways that were known to Ray and Segura. (a)
In 2006-2007 she hired Ramona Eaglesmith as the teacher, coach and
choreographer of the QHS Girls Dance Team that performed at half-
time during home basketball games. Ray was the QHS Athletic
Director for most of that year. (b) In 2009-2010, she responded to
a request by Segura by hiring Ramona to teach dance to a group of
QHS students in Segura's presence. (c) In early 2010, Cox attended
meetings with QHS high school girls at which Segura granted them
permission to form a QHS Dance team, establish dance as a school
sport at the high school, and recruit a coach for the team. The
girls expressed their desire at those meetings to have Ramona
Eaglesmith selected as the QHS dance team coach. (d) Cox helped the
QHS girls write a QHS Dance Team proposal and spoke at an August
13, 2010 meeting with Segura and Ray advocating that Ramona be
selected as the Dance Team coach in which event she would receive a
stipend from the District for coaching.

1       38.   On May 13, 2010, Segura threatened members of the QHS

2   Girls Cheer Team that they would be disqualified from the team if

3   they took private dance lessons during the 2010-2011 school year.

4   Segura did not explain the rationale for her directive.

5       39.   At the time of Segura's May 2010 directive, Cox's

6   Footloose Dance Studio was offering cheer team members the same

7   opportunity it had provided to members of the cheerleading team

8   during the previous year.   In 2009-2010, Footloose offered a

9   special opportunity to members of the QHS Cheer Team.   It invited

10  them to take a jazz conditioning class from Ramona Eaglesmith at

11  which they also learned dance steps.   Between ten and twelve

12  members attended that class.   In the past, Footloose had also

13  provided a conditioning class to boys participating in the QHS

14  athletic program.   At those times, Footloose scheduled its classes

15  so they would not conflict with team practice. Participation was

16  voluntary and in many cases fees were waived.   Nevertheless,

17  barring students from taking classes in 2010-2011 reduced the

18  income of the studio and Ramona Eaglesmith.

19      40.   The IEP of the special needs student who was assigned to

20  Cox directed Cox to spend time with her on the campus during the

21  summer months to transition her from elementary school to the QHS

22  middle school.

23      41.   Cox had master keys during most of her 30 year career

24  with the District.   She had used them to provide access to the QHS

25  Gym by Eaglesmith during the 2009-2010 basketball season.   Although

26  Segura required Cox to turn in her keys, many classified employees

27  retained their master keys.

28      42.   On August 13, 2010, Cox advocated to Ray and Segura on

behalf of the girls who were forming a QHS Dance Team that they select Ramona Eaglesmith as its coach and choreographer.  They ordered that Cox not assist teachers or coaches.  They made clear that the Eaglesmiths should not be part of anything at QHS, and that her association with them would be bad.  They told her that the girls could not have a Dance team if Ramona had anything to do with it because "the Eaglesmiths play the race card and that will not be tolerated."

43.  In August 2010, after her August 13, 2010 meeting with Ray and Segura, Cox removed Ramona Eaglesmith's name from the QHS Dance Team proposal that the girls presented to Segura and Ray. The QHS Dance Team thereafter during 2010-2011 performed at QHS events, was publicly recognized as the QHS Dance Team, and its participants received official school letters and certificates.

44.  On approximately August 23, 2010, prior to the beginning of the students' school year, Segura removed the belongings, materials, student files and records, and desk of Eileen Cox from Room 11, her former base of operations and placed them in a storage closet at QHS. She did not impose those conditions on similarly-situated QHS employees.

45.  On August 25, 2010, Segura and administrator Willits took Cox to the storage area where Segura had placed Cox's papers and threw away her records without regard to the required retention periods, legal requirements and personal significance to her.

46.  Immediately prior to the beginning of the school year, Segura removed Cox's "workability" and other records from the previous year. She threw away some of Cox's records.  A few days later, she accused Cox of not having sufficient record of her past

1 | year's work as a Vocational Specialist.

2 |     47. Beginning at the opening of the 2010-2011 school year,
3 | Segura denied Cox a location at the QHS campus to serve as her base
4 | of operations at QHS. Segura required Cox to appear each day in
5 | the main office to await her assignment. Segura provided to other
6 | Instructional Aides a desk and classroom to serve as their base of
7 | operations.

8 |     48. Segura took away Cox' keys, thereby denying her access to
9 | the rest room. She required Cox for several weeks to enlist a staff
10 | member or student to accompany her to, and enable her to enter, the
11 | rest room. Then, Segura required her to go to the main office to
12 | obtain a key to enter a rest room. Later, she ordered Cox to write
13 | her name on the white board in the classroom prior to leaving to
14 | use the rest room. Segura did not impose those requirements or
15 | conditions on similarly-situated employees.

16 |     49. On August 25, 2010, the second day of school, for the
17 | first time in Cox's 30-year District employment, a District
18 | administrator, Segura, accused her of incompetence.

19 |     50. During the prior two years she served in that position
20 | (2008-2009 and 2009-2010), Cox's performance was not criticized by
21 | anyone, including her immediate supervisor, the District Vocational
22 | Specialist Coordinator. Nor was her paperwork criticized by any
23 | other District Administrator.

24 |     51. The Sunshine Club that Cox had created, supported
25 | employees by acknowledging various successes and sadness in their
26 | lives. Segura claimed that teachers did not want the program.
27 | Teachers told Cox otherwise.

28 |     52. Segura prevented Cox from fulfilling her obligation under

1   federal law to implement the requirements of her special education

2   student's Individual Education Plan (IEP).   Segura overrode

3   requirements established by the official committee that formulated

4   the IEP.

5        53.   During Cox's scheduled time to complete work, she was

6   locked out of room 11 on several days, including September 9, 22;

7   October 7; November 4, 17, 19, 22, and 30.

8        54.   During the 2010-2011 evaluation process, Segura

9   instituted a separate set of rules for Cox that were not set by the

10  special education teachers to which she was assigned.   On September

11  10, 2010, Segura ordered that her special education student could

12  not accompany her to the copy room, an experience Cox has used as a

13  positive enforcement tool.   On November 22, 2010, Segura changed

14  Cox's assignment by directing that she not leave the classroom of

15  the Special Education teacher to whom she was assigned.   On January

16  4, 2011, Segura directed Cox to cease enlarging print for a 1-on-1

17  student, and directed that she call another aide from another

18  classroom to get whatever needs copying or taken care of outside

19  the classroom for the student.   These directives differed from the

20  requirements that Segura applied to the other QHS Instructional

21  Aides.

22       55.   Segura directed Cox to attend disciplinary meetings;

23  informed her that she had a right to representation at the meeting

24  by her CSEA representative, a right employees have under the

25  collective bargaining agreement at any disciplinary meeting;

26  criticized her conduct; admonished her to change her conduct; gave

27  Cox verbal warnings, a form of discipline under District policy;

28  and threatened her with harsher consequences if she failed to

correct her behavior.

56.   On September 10, 2010, Segura and Ray also threatened Cox with discipline if she requested that a union representative be present during a meeting Segura had announced as disciplinary.

57.   On September 17, 2010, Segura and Ray barred Eileen Cox from volunteering her services at District programs and events. Cox had "worked the gate" at almost all sporting events during her 30 year career at QHS.  Ray claimed that there were other volunteers to replace Cox, but the District thereafter had to pay for those services.

58.   In the face of continuing accusations of misconduct and incompetence, Cox sought medical help to cope with and recover from accusations she considered false and hurtful.  On October 13, 2010, after having been referred by her family physician, she began to meet with a licensed clinical social worker for counselling. She had never previously sought counselling or therapy.

59.   District policy guarantees that discipline only be issued for "just cause." That requirement bars the employer from imposing discipline without specifying, among other facts, what omission or commission the employee is being charged with.

60.   On November 16, 2010, after CSEA complained that Segura denied Cox a key and about the other requirements Segura imposed on her to gain access to the restroom, Segura removed the external locks on the staff rest rooms.  Segura's removal of the locks caused Cox's co-workers to be angry about lack of security, and to blame Cox for the new policy.

61.   On December 2, 2010, Segura summoned her and required her to wait outside her office.  Cox overheard Segura tell Bruce

1   Williams that Segura would do anything to get rid of her.

2       62.   Despite the advice of a special education teacher to

3   which Cox was assigned, who recommended that the student with whom

4   she worked should be assisted during the school day for short

5   periods by several different aides, Segura assigned Cox mid-year to

6   be the student's sole aide for 6.5 hours a day.

7       63.   On December 16, 2010, Segura verbally reprimanded Cox for

8   attending a Workability meeting at the District Office.   As the QHS

9   Vocational Specialist, Cox was part of the Workability program.

10      64.   On January 3, 2011, Segura accosted Cox in the copy room,

11  demanded to know what she was doing, followed her to the main

12  office, demanded a yellow pad so she could document what Cox was

13  doing, and sat behind her in a classroom for twenty minutes taking

14  notes.   On the same date, Segura yelled at Cox for attending a

15  staff collaboration meeting.

16      65.   On January 6, 2011, a special education teacher told Cox

17  that Segura had directed him to "shadow" her, take notes

18  documenting her activities and location, and report the information

19  to Segura to be used as a basis of discipline or negative

20  evaluation.   The shadowing disrupted the special education program.

21  Segura did not subject similarly-situated employees to the same

22  evaluation process, specifically the "shadowing."

23      66.   Their presence caused Cox's special education student to

24  have a difficult day.

25      67.   Segura did not require similarly-situated employees to

26  fill out a form that detailed their activities in fifteen and

27  thirty minute intervals.

28      68.   On January 25, 2011, Cox stopped by the main office to

1 say "good morning" to a staff person before work hours.  Later, the
2 staff person told her that Segura had asked her why Cox was in the
3 office.

4     69.  On January 25, 2011, a Central Office administrator
5 acknowledged that she was aware of the treatment by Segura that Cox
6 complained of, that she is "on Cox's side," but that she had to
7 defer to Segura because she is the site administrator.

8     70.  Segura's demeanor toward Cox included standing up,
9 getting close to her face, pointing at her, yelling accusations,
10 including that she was incompetent, and screaming down the hall
11 directing her to get back in the classroom.

12     71.  The District treated Eileen Cox adversely by imposing
13 discipline on her and engaging in a course of conduct in 2010-2011
14 by which Segura purported to evaluate her performance in violation
15 of the remedial purpose and procedures required by the State
16 Education Code and the collective bargaining agreement, and,
17 instead, was used as an instrument to "get rid of" Ms. Cox from QHS
18 and or the District.

19     72.  District treated Eileen Cox adversely because they
20 perceived her to be associated with, and supportive of, J.C.
21 Eaglesmith and Ramona Eaglesmith.

22     73.  District administrators revealed their discriminatory
23 animus against Eileen Cox by subjecting her to disparate treatment
24 compared to similarly situated staff members who Segura and Ray did
25 not perceive as associating with, and supporting, J.C. Eaglesmith.

26     74.  Eileen Cox engaged in protected activity by (1) making
27 complaints that District administrators were discriminating and
28 retaliating against her because of her association with and support

1  for J.C. Eaglesmith and Ramona Eaglesmith, and (2) advocating

2  compliance with State and Federal laws that protect public

3  employees against discrimination and retaliation.

4       75.   Eileen Cox's perceived association with and support of

5  J.C. Eaglesmith and Ramona Eaglesmith, and her protected activity

6  were a substantial motivating factor for the District's adverse

7  action against Eileen Cox.

8       76.   Eileen Cox was harmed by losing benefits, and suffering

9  humiliation, mental anguish and emotional distress.

10      77.   The District's adverse actions were a substantial factor

11  in causing harm to Eileen Cox.

12      78.   The District owes Cox for lost benefits during the period

13  she has received counseling.

14      79.   The amount of unpaid benefits for that period are

15  (currently updating amount).

16      80.   The District willfully failed to pay the benefits owed to

17  Cox.

18      Defendants' Disputed Facts – Plaintiff J.C. Eaglesmith:

19      1.    Eaglesmith was not excluded from the coaches' office at

20  QHS, nor was he accused of theft during the 2009/2010 school year.

21  The District changed the lock on the door to the coaches' office,

22  which affected all employees and coaches equally, including the

23  principal who did not have a key.

24      2.    Eaglesmith was never directed to change his clothes in a

25  janitor's closet.

26      3.    Eaglesmith had access to the coaches' locker room and

27  toilet room at all times during the 2009/2010 basketball season.

28      4.    Eaglesmith's allegations regarding the use of the locker

1   room and coaches' office were simple miscommunications or

2   misunderstandings by Eaglesmith as found by the District

3   investigator.

4       5.   Eaglesmith received support from Segura or Ray regarding

5   junior varsity coach Howard Hughes's alleged insubordination

6   during the 2009/2010 basketball season.   Segura even instituted

7   weekly meetings with Eaglesmith and Hughes in an effort to resolve

8   this issue.   Eaglesmith's Native American ancestry was never

9   raised by Hughes, nor did it figure in any discussions of Hughes's

10   failure to follow Eaglesmith's directions.

11       6.   Eaglesmith's complaints during the basketball season

12   2009/2010 at QHS include events that did not involve him, that he

13   did not personally witness and which are completely unconnected to

14   any employment action taken against him or his Native American

15   ancestry, e.g., fighting between the JV and Varsity teams, or

16   complaints to CPS about a football coach Bryon Hughes, the son of

17   Howard Hughes.   These complaints are irrelevant to the case.

18       7.   Eaglesmith was not rehired as head coach for the

19   2010/2011 season because he received an unsatisfactory coaching

20   evaluation from the 2009/2010 season.

21       8.   Eaglesmith's Native American ancestry played no role in

22   any decision made by Segura or the District.

23       9.   Defendants Segura and Ray treated Eaglesmith no

24   different from Mike Woodlee.

25       10.   The collective bargaining agreement progressive

26   discipline and evaluation procedures are inapplicable to the head

27   basketball part-time extra duty positions.

28       11.   The District hired an independent investigator to

1  investigate all of Eaglesmith's claims of discrimination and

2  retaliation and that investigator found no evidence of

3  discrimination or retaliation.

4      12.  Defendant Jeff Ray was not Eaglesmith's supervisor.

5      13.  Defendant Jeff Ray made no decisions affecting

6  Eaglesmith's employment.

7      14.  Defendant Jeff Ray never made any derogatory remarks to

8  Eaglesmith regarding his religion or spiritual beliefs.

9      15.  Defendant Sue Segura never made any derogatory remarks

10  to Eaglesmith regarding his religion or spiritual beliefs.

11      16.  Defendant Jeff Ray never made any derogatory remarks to

12  Eaglesmith regarding his Native American ancestry.

13      17.  Defendant Sue Segura never made any derogatory remarks

14  to Eaglesmith regarding his Native American ancestry.

15      18.  Neither Defendant Ray or Segura ever treated Eaglesmith

16  differently because of his national origin or religion.

17      19.  The District never treated Eaglesmith differently

18  because of his national origin or religion.

19      20.  District administrators asked Eaglesmith to remove his

20  baseball cap in October 2010 at a staff meeting held indoors

21  because they were enforcing the student dress code which they

22  believed in good faith was also applicable to staff.  Eaglesmith

23  was not the only staff member asked to remove a hat.

24      21.  Eaglesmith acted in an insubordinate manner towards his

25  supervisor Oestreich on the day she asked him to remove his hat

26  and received a written warning for that reason.

27      22.  Eaglesmith has no claim for disability discrimination in

28  this case and accordingly all issues related to his medical

1  necessity to wear dark glasses are irrelevant.

2      23.  The truck parked in the District office parking lot by

3  Yvonne Bales on November 3, 2010 had nothing to do with Eaglesmith

4  or any employment action taken against him.

5      24.  The District investigated Eaglesmith's complaint about

6  the truck and it was not related to Eaglesmith in any manner.

7      25.  The District prohibited Yvonne Bales from bringing the

8  truck onto District property immediately after learning she had

9  parked it in the District office on November 3, 2010.

10     26.  Eaglesmith's request to transfer to Greenville was

11 denied in 2011 because he did not possess the required special

12 education credential.

13     27.  Eaglesmith requested and received a transfer to his

14 current position because the District was able to waive the

15 multiple subject credential requirement.

16     28.  Eaglesmith claims the $2534 stipend paid to the head

17 basketball coach at QHS for the 2010/2011 season as part of his

18 damages because he was not rehired.  Because the District had a

19 legitimate business reason for its hiring decision, Eaglesmith

20 suffered no such damage.

21     29.  Eaglesmith cannot connect his leave of absence from

22 December 9, 2010 to June 2011 to any unlawful discrimination based

23 on his Native American ancestry.

24     30.  Eaglesmith lost no more than $12,062 while on leave from

25 December 9, 2010 to June 2011 as Eaglesmith received differential

26 pay and credit for sick days.  Eaglesmith did not lose any

27 benefits during this timeframe.  Also, Eaglesmith failed to

28 mitigate his damages as he did not apply for disability benefits.

31.  Eaglesmith cannot link any of his alleged damages to any discriminatory or retaliatory act by Defendants.

Defendants' Disputed Facts - Plaintiff Eileen Cox:

1.  Cox was not subjected to any disciplinary action by the District.

2.  Cox did not suffer any monetary loss whatsoever at any time during her employment with the District as she never lost any hours.

3.  As a Vocational Specialist, Cox's job duties included assisting students in completing Individual Transition Plans ("ITPs").  Cox failed to properly complete ITPs as a Vocational Specialist at QHS from 2009/2011.

4.  Tori Willits, the Director of Education Services (which included special education) was not satisfied with Cox's performance as a Vocational Specialist in 2009/2010, but she did not make Segura aware of her dissatisfaction until August 2010.

5.  During an August 2010 administrative meeting, Willits told Segura that QHS's ITPs were not acceptable.

6.  When Segura evaluated Cox for the 2010/2011 school year, she contacted Willits to ask how Cox was doing in the Vocational Specialist position, and Willits told her, "Not good."

7.  Several of Cox's ITPs stated that the student's goal was to administer the assessment test upon the student's graduation from high school.

8.  Piers Strailey was the special education teacher Cox worked under in 2009/2010.  He testified at his deposition that Cox did not always administer career tests to students and did not always complete her ITPs, even though both were part of her job

1  duties.

2      9.   A master key was not required for Cox to use the
3  restroom.

4      10.  Special education aides are not assigned offices or
5  desks.

6      11.  Cox has no claim in this case related to her dance
7  studio Footloose, her dance team, or the QHS dance team.

8      12.  Cox never made the District aware of her support for
9  Eaglesmith before she received a "Needs Improvement" on her
10 performance evaluation for school year 2010/2011.

11     13.  The District never made any decision about Cox's job
12 performance based upon her association with or support of
13 Eaglesmith.

14     14.  For the special education aide position, Segura received
15 input from a new teacher Cox worked under in 2010/2011, and based
16 on this input, Segura rated Cox as "Needs Improvement" in some of
17 the categories in that evaluation.

18     15.  The District had legitimate reasons for the "Needs
19 Improvement" remarks in Cox's evaluations because Cox performed
20 poorly in certain aspects of her job duties in 2010/2011.

21     16.  Cox's job duties were not changed, nor were the terms
22 and conditions of her employment.

23     17.  Cox suffered no damage.

24     18.  Cox never lost any wages.

25     19.  Cox never filed any complaint of discrimination against
26 Segura.

27     20.  Cox never voiced her support of Eaglesmith to Segura.
28 ///

37

1
## VI.  DISPUTED EVIDENTIARY ISSUES

2
### Plaintiffs' Disputed Evidentiary Issues:

3     Plaintiffs intend to file a motion in limine to exclude any

4 evidence concerning prior lawsuits in which J.C. Eaglesmith was a

5 plaintiff on the ground that such evidence is not relevant to the

6 issues in the instant lawsuit.

7
### Defendants' Disputed Evidentiary Issues:

8     Defendants anticipate the following evidentiary issues that

9 they will address in motions in limine:

10    (1)  Specific incidents of alleged discrimination and

11 harassment by Eaglesmith during his tenure as head QHS basketball

12 coach during the 2004-2007 timeframe.

13    (2)  Any evidence related to the pickup truck Yvonne Bales

14 parked in the District office parking lot on November 3, 2010.

15    (3)  Limitation on evidence to incidents that could

16 reasonably be found to be adverse employment actions, which must

17 be something that materially affected the terms or conditions of

18 plaintiffs' employment.

19    (4)  Testimony and evidence regarding claims by former

20 Plaintiffs Ramona Eaglesmith and Bruce Barnes.

21    (5)  Testimony and evidence regarding the employment status

22 of Glenn Harris, Jeff Ray or Sue Segura.

23    (6)  Testimony and evidence regarding any prior complaints

24 against Glenn Harris before his hire at the District.

25    (7)  Testimony and evidence regarding Eileen Cox's emotional

26 distress claim by Kathleen Hughes.

27    (8)  Testimony and evidence by Michael Chelotti.

28    (9)  Testimony and evidence regarding the alleged comment by

Bruce Williams in 2006 that Eaglesmith was a "big, scary Indian."

(10) Testimony and evidence regarding Justus Eaglesmith allegedly not being allowed to serve as ball boy and being instructed on how to say the Pledge of Allegiance.

(11) Testimony and evidence regarding the 2006 Thanksgiving presentation by the Eaglesmith family at QHS and Taylorsville Elementary.

(12) Testimony and evidence about the Footloose Dance Studio, or the QHS dance team.

(13) Testimony and evidence about the OCR complaint filed in the 1990s against the District regarding issues of student discipline.

## VII.   RELIEF SOUGHT

Plaintiffs seek actual damages (including lost wages, earnings, benefits), compensatory damages (for humiliation, mental anguish and emotional distress); an award of attorneys' fees and costs of suit; plus interest at the prevailing rate.

Defendants seek costs plus interest at the prevailing rate, and potentially attorneys' fees for Plaintiffs' filing of frivolous claims.

## VIII.   POINTS OF LAW

Trial briefs shall be E-filed with the court no later than seven (7) days prior to the date of trial, i.e., May 13, 2013.  Any points of law not previously argued to the Court should be briefed in the trial briefs.

## IX.   ABANDONED ISSUES

The parties are not aware of any abandoned issues in this case.

X.   WITNESSES

Plaintiffs expect to present the witnesses listed in Exhibit A, attached hereto.

Defendants expect to present the witnesses listed on Exhibit B, attached hereto.

Plaintiffs have issued a subpoena to the District's current superintendent Micheline Miglis.  Superintendent Miglis is a new hire and Defendants contend that she has no personal knowledge regarding any claim stated by either Plaintiff in this case.  The Defendants may file a motion to quash this subpoena which plaintiffs intend to oppose.

Each party may call a witness designated by the other.

A.   No other witnesses will be permitted to testify unless:

(1)   The party offering the witness demonstrates that the witness is for the purpose of rebutting evidence which could not be reasonably anticipated at the Pretrial Conference, or

(2)   The witness was discovered after the Pretrial Conference and the proffering party makes the showing required in "B" below.

B.   Upon the post-Pretrial discovery of witnesses, the attorney shall promptly inform the court and opposing parties of the existence of the unlisted witnesses so that the court may consider at trial whether the witnesses shall be permitted to testify.  The evidence will not be permitted unless:

(1)   The witnesses could not reasonably have been discovered prior to Pretrial;

(2)   The court and opposing counsel were promptly notified upon discovery of the witnesses;

1            (3)  If time permitted, counsel proffered the witnesses

2  for deposition;

3            (4)  If time did not permit, a reasonable summary of the

4  witnesses' testimony was provided opposing counsel.

5           XI.  <u>EXHIBITS, SCHEDULES AND SUMMARIES</u>

6     Plaintiffs expect to offer the exhibits listed on Exhibit C,

7  attached hereto.

8     Defendants expect to offer the exhibits listed on Exhibit D,

9  attached hereto.  The exhibits have been renumbered by the Court

10  and all duplicate exhibits have been removed from the exhibit

11  lists.

12     Each party may use an exhibit designated by the other.

13     A.   No other exhibits will be permitted to be introduced

14  unless:

15            (1)  The party proffering the exhibit demonstrates that

16  the exhibit is for the purpose of rebutting evidence which could

17  not be reasonably anticipated at the Pretrial Conference, or

18            (2)  The exhibit was discovered after the Pretrial

19  Conference and the proffering party makes the showing required in

20  paragraph "B," below.

21     B.   Upon the post-Pretrial discovery of exhibits, the

22  attorneys shall promptly inform the court and opposing counsel of

23  the existence of such exhibits so that the court may consider at

24  trial their admissibility.  The exhibits will not be received

25  unless the proffering party demonstrates:

26            (1)  The exhibits could not reasonably have been

27  discovered prior to Pretrial;

28            (2)  The court and counsel were promptly informed of

1 their existence;

2     (3)   Counsel forwarded a copy of the exhibit(s) (if
3 physically possible) to opposing counsel.  If the exhibit(s) may
4 not be copied, the proffering counsel must show that he has made
5 the exhibit(s) reasonably available for inspection by opposing
6 counsel.

7     As to each exhibit, each party is ordered to exchange copies
8 of the exhibit not later than fourteen (14) days before trial.
9 Each party is then granted five (5) days to file and serve
10 objections to any of the exhibits.  In making the objection, the
11 party is to set forth the grounds for the objection.  The parties
12 shall pre-mark their respective exhibits in accord with the Court's
13 Pretrial Order.  Exhibit stickers may be obtained through the
14 Clerk's Office.  An original and one (1) copy of the exhibits shall
15 be presented to Harry Vine, Deputy Courtroom Clerk, at 8:30 a.m. on
16 the date set for trial or at such earlier time as may be agreed
17 upon.  Mr. Vine can be contacted at (916) 930-4091 or via e-mail
18 at: hvine@caed.uscourts.gov.  As to each exhibit which is not
19 objected to, it shall be marked and may be received into evidence
20 on motion and will require no further foundation.  Each exhibit
21 which is objected to will be marked for identification only.

22               XII.   DISCOVERY DOCUMENTS

23     Plaintiffs expect to introduce the video deposition testimony
24 of James Lake (see Exhibit E attached hereto).

25     Defendants expect to present all testimony by live witnesses.

26             XIII.   FURTHER DISCOVERY OR MOTIONS

27     Pursuant to the court's Status Conference Order, all discovery
28 and law and motion was to have been conducted so as to be completed

as of the date of the Pretrial Conference.  That order is
confirmed.  The parties are free to do anything they desire
pursuant to informal agreement.  However, any such agreement will
not be enforceable in this court.

### XIV.  STIPULATIONS

The parties agree to authenticate by stipulation all
documents prepared by Defendants and produced to Plaintiffs in
discovery.  Further, the parties agree to authenticate by
stipulation all documents prepared by Plaintiffs and produced to
Defendants in discovery.  By "prepared" the parties intend to mean
that the documents were authored by an employee or representative
of the District on behalf of the District, or by one of the
Plaintiffs.  By agreeing to this stipulation neither party waives
the right to later dispute the authenticity of a particular
document if that document does not clearly fit within this
stipulation.

### XV.  AMENDMENTS/DISMISSALS

Plaintiffs and Defendants do not anticipate any further
amendments or dismissals.

### XVI.  FURTHER TRIAL PREPARATION

A.  Counsel are directed to Local Rule 285 regarding the
contents of trial briefs.  Such briefs should be E-filed seven (7)
days prior to trial, i.e., May 13, 2013.

B.  Counsel are further directed to confer and to attempt to
agree upon a joint set of jury instructions.  The joint set of
instructions shall be lodged via ECF with the court clerk seven (7)
calendar days prior to the date of the trial, i.e., May 13, 2013,
and shall be identified as the "Jury Instructions Without

1  Objection."  As to instructions as to which there is dispute the
2  parties shall submit the instruction(s) via ECF as its package of
3  proposed jury instructions three days before trial, i.e., May 17,
4  2013.  This package of proposed instructions should not include the
5  "Jury Instructions Without Objection" and should be clearly
6  identified as "Disputed Jury Instructions" on the proposed
7  instructions.

8      The parties shall e-mail a set of all proposed jury
9  instructions in word format to the Court's Judicial Assistant, Jane
10 Klingelhoets, at: jklingelhoets@caed.uscourts.gov.

11      C.    It is the duty of counsel to ensure that any deposition
12 which is to be used at trial has been lodged with the Clerk of the
13 Court pursuant to Local Rule 133(j).  The depositions shall be
14 lodged with the court clerk seven (7) calendar days prior to the
15 date of the trial.  Counsel are cautioned that a failure to
16 discharge this duty may result in the court precluding use of the
17 deposition or imposition of such other sanctions as the court deems
18 appropriate.

19      D.    The parties are ordered to E-file with the court and
20 exchange between themselves not later than one (1) week before the
21 trial a statement designating portions of depositions intended to
22 be offered or read into evidence (except for portions to be used
23 only for impeachment or rebuttal).

24      E.    The parties are ordered to E-file with the court and
25 exchange between themselves not later than one (1) week before
26 trial the portions of Answers to Interrogatories which the
27 respective parties intend to offer or read into evidence at the
28 trial (except portions to be used only for impeachment or

1   rebuttal).

2       F.    Each party may submit proposed voir dire questions the

3   party would like the court to put to prospective jurors during jury

4   selection.   Proposed voir dire should be submitted via ECF one (1)

5   week prior to trial.

6       G.    Each party may submit a proposed verdict form that the

7   party would like the Court to use in this case.   Proposed verdict

8   forms should be submitted via ECF one (1) week prior to trial.

9       H.    In limine motions shall be E-filed separately at least ten

10  (10) days prior to trial, i.e., May 10, 2013.   Opposition briefs

11  shall be E-filed five (5) days prior to trial, i.e., May 15, 2013.

12  No reply briefs may be filed.

13                   XVII.   SETTLEMENT NEGOTIATIONS

14      A Settlement Conference is set before Magistrate Judge Allison

15  Claire on April 16, 2013, at 9:00 a.m.

16      Each party is directed to have a principal capable of

17  disposition at the Settlement Conference or to be fully authorized

18  to settle the matter on any terms at the Settlement Conference.

19      Each party is directed to submit to the chambers of Magistrate

20  Judge Allison Claire a confidential settlement conference statement

21  seven (7) days prior to the conference.   Such statements are

22  neither to be filed with the clerk nor served on opposing counsel.

23  However, each party shall notify the other party that the statement

24  has been submitted to the magistrate judge's chambers.

25                     XVIII.   AGREED STATEMENTS

26      See paragraph III, *supra*.

27                   XIX.   SEPARATE TRIAL OF ISSUES

28      As stated above, plaintiffs oppose the bifurcation of the

1  trial into two trials. Defendants request separate trials of each

2  Plaintiff's claims against them.  Defendants may file a motion to

3  bifurcate the trial of Plaintiff J.C. Eaglesmith from that of

4  Plaintiff Eileen Cox as Defendants believe that each Plaintiff has

5  claims that are separate and distinct, and there is very little

6  overlap in witnesses and no overlap in documentary evidence.

7  Defendants contend that trying both cases together would tend to

8  confuse the jury and the issues and would be prejudicial to

9  Defendants.  The Court has indicated that it is unlikely to grant a

10 motion to bifurcate.

11            XX.   IMPARTIAL EXPERTS/LIMITATION OF EXPERTS

12       The parties do not believe that an impartial expert or a

13 limitation on experts is necessary.

14                      XXI.  ATTORNEYS' FEES

15       The matter of the award of attorneys' fees to prevailing

16 parties pursuant to statute will be handled by motion in accordance

17 with Local Rule 293.

18                      XXII.  MISCELLANEOUS

19       None.

20            XXIII.  ESTIMATE OF TRIAL TIME/TRIAL DATE

21       The parties estimate ten (10) to twelve (12) court days for

22 trial.  Trial will commence on May 20, 2013, at 9:00 a.m.

23       Counsel are to call Harry Vine, Courtroom Deputy, at

24 (916) 930-4091, one week prior to trial to ascertain the status of

25 the trial date.

26 ///

27 ///

28 ///

1      XXIV.   OBJECTIONS TO PRETRIAL ORDER

2          Each party is granted seven (7) days from the date of this

3    Pretrial Order to object to it via ECF.

4          IT IS SO ORDERED.

5          DATED: March 25, 2013.

6                                    _____

7                                    JOHN A. MENDEZ
                                     United States District Court Judge

47

**EXHIBIT A**

1  DAN SIEGEL, SBN 56400
   PETER HABERFELD, SBN 41723
2  MICHAEL SIEGEL, SBN 269439
3  SIEGEL & YEE
   499 14th Street, Suite 300
4  Oakland, CA  94612
   Telephone: (510) 839-1200
5  Facsimile: (510) 444-6698

6
   Attorneys for Plaintiffs
7  JERALD CLINTON (J.C.) EAGLESMITH
   and EILEEN COX
8

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12 JERALD CLINTON (J.C.) EAGLESMITH  )  Case No. 2:11-CV-00098-JAM-JFM
13 and EILEEN COX,                   )
                                     )  PLAINTIFFS' WITNESS LIST
14          Plaintiffs,              )
15     vs.                           )  EXHIBIT A
                                     )
16 JEFF RAY, as an individual, SUE   )
   SEGURA, as an individual, and BOARD )
17 OF TRUSTEES OF PLUMAS COUNTY      )
   OFFICE OF EDUCATION/ PLUMAS       )
18 COUNTY UNIFIED SCHOOL DISTRICT,   )
19                                   )
            Defendants.              )
20                                   )

21

22     Plaintiffs J.C. Eaglesmith and Eileen Cox may call the following witnesses to

23 testify at trial in this case:

24     1.   John Abell, 1084 Corino Real, Chico, CA 95926;

25     2.   Yvonne Bales, 50 Church Street, Quincy, CA 95971;

26     3.   Bruce Barnes, 205 Lundy Lane, Blairsden, CA 96103;

27     4.   Ken Capistrand, 50 Church Street, Quincy, CA 95971;

28     5.   Frank Carey, 50 Church Street, Quincy, CA 95971;

---

*Eaglesmith v. Ray*, Case No.2:11-CV-00098-JAM-JFM
Plaintiffs' Witness List - 1

6.   Mike Chelotti, P.O. Box 515, Greenville, CA 95947;

7.   Ron Collins, P.O. Box 225, French Gulch, CA 96033;

8.   Don Conn, 160 Rock Street, Portola, CA 96122;

9.   Eileen Cox, Siegel & Yee, 499 14th Street, Suite 300, Oakland, CA 94612;

10.  Mitzie D. Cox, 8221 Riviera Beach Drive, Las Vegas, NV 89128;

11.  Beth Curtis, 1331 Garden Highway, Suite 300, Sacramento, CA 65853;

12.  Liz Dutton, P.O. Box 205, Meadow Valley, CA 95956;

13.  J.C. Eaglesmith, Siegel & Yee, 499 14th Street, Suite 300, Oakland, CA 94612;

14.  Justus Eaglesmith, Siegel & Yee, 499 14th Street, Suite 300, Oakland, CA 94612;

15.  Ramona Eaglesmith, Siegel & Yee, 499 14th Street, Suite 300, Oakland, CA 94612;

16.  Joe Estrada, 190 Jenny's Lane, Fernley, NV 89408;

17.  Dennis Fowler, 392 Borolo Circle, Greenfield, CA 93927;

18.  Randy Gilbert, 22509 Adobe Road, Red Bluff, CA 96080;

19.  Taylor Gipe, 4059 North Valley Road, Greenville, CA 95947;

20.  Dr. Matt Glavich, 132 Porterville Creek Drive, Cloverdale, CA 95425;

21.  Tom Goss, 2056 East Main Street, #3, Quincy, CA 95971;

22.  Glenn Harris, 86 Crestview Drive, Quincy, CA 95971;

23.  Robin Hood, 147 Clough Street, Quincy, CA 95971;

24.  Howard Hughes, 1958 Claremont Way, #2, Quincy, CA 95971;

25.  Kathleen Hughes, L.C.S.W., 711 E. Main Street, Quincy, CA 95971;

26.  Cathy Hunter, 462820 Clear Creek Drive, Clear Creek, CA 96137;

27.  Willie Hyman, P.O. Box 1894, Chico, CA 95927;

28.  Theo Jackson, P.O. Box 3858, Quincy, CA 95971;

29.  Dave Keller, 26 Crestview Drive, Quincy, CA 95971;

30.  Ricky King, 140 Louisiana Avenue, Quincy, CA 95971;

31.  Steve King, 140 Louisiana Avenue, Quincy, CA 95971;

32.  Jonathan Kusel, Jonathan, 1657 Diamond Mountain Road, Greenville, CA 95947;

33.  Jim Lake by deposition;

34.  Sara Taylor Mayes; 2056 Cedar Street, Quincy, CA 95971;

35.  Dan McCabe, P.O. Box 1882, Quincy, CA 95971

36.  Mike McCabe, P.O. Box 1882, Quincy, CA 95971;

37.  Micheline Miglis, 50 Church Street, Quincy, CA 95971;

38.  Gary Miller, 50 Church Street, Quincy, CA 95971;

39.  Ross Morgan, M.D., 1060 Valley View Drive, Quincy, CA 95971;

40.  Laura Morrison, Ph.D., P.O. Box 979, Graeagle Village Center, Graeagle, CA 96103;

41.  Terry Oestreich, 50 Church Street, Quincy, CA 95971;

42.  Margo Rich Ogus, Ph.D. Economic Solutions, Inc., 438 Cambridge Avenue, Suite 225, Palo Alto, CA 04306;

43.  David Pinson, P.O. Box 1941, Blairsden, CA 96103;

44.  Steve Popish, 851 Raccoon Road, Clear Creek, CA 96137;

45.  Jackie Potillor, 72 North Mill Creek Road, Quincy, CA 95971;

46.  Mary Ann Prewitt, 55A Redberg Ave, Quincy, CA 95971;

47.  Jeff Ray, 50 Church Street, Quincy, CA 95971;

48.  Harry Rogers, 4059 North Valley Road, Greenville, CA 95947;

49.  Tre Ross, 72 North Mill Creek Lee Road, Quincy, CA 95971;

50.  Sue Segura, 50 Church Street, Quincy, CA 95971;

51.  Jack Siedman, P.O. Box 37, Bolinas, CA 94924;

52.  Ashley Stevenson, 171 Bell Lane, Quincy, CA 95971;

53.  Faith Strailey, P.O. Box 3012, Quincy, CA 95971;

54.  Piers Strailey, P.O. Box 3012, Quincy, CA 95971;

55.  Terry McDonald Taylor, 2929 Chandler Road, Quincy, CA 95971;

56. Kevin Triance, 482 Selkirk Ranch Road, Angels Camp, CA 95222;

57. Donna Waller, P.O. Box 34, Portola, CA 96122;

58. Melissa McIntyre Wiebe, 4310 Nelson Street, Taylorsville, CA 95983;

59. Bruce Williams, 50 Church Street, Quincy, CA 95971;

60. Tori Willits, 50 Church Street, Quincy, CA 95971;

61. Mark Womack, 18573 Spicer Lake Court, Reno, NV 89508;

62. Mike Woodlee, 530 Hillside Drive, Quincy, CA 95971;

63. Martha Wright, 408 B Bell Lane, Quincy, CA 95971;

64. Judi Yokum, 212 Grand Street, Greenville, CA 95947;

65. Richard Zunino, 3071 Green River Court, Reno, NV 89503.


Dated: March 15, 2013

SIEGEL & YEE


By /s/ *Peter Haberfeld*
Peter Haberfeld

Attorneys for Plaintiffs
J.C. EAGLESMITH and
EILEEN COX

**<u>EXHIBIT B</u>**

# EXHIBIT B

| | DEFENDANTS' TRIAL WITNESS LIST FOR THE CLAIMS BROUGHT BY PLAINTIFF J.C. EAGLESMITH: |
|---|---|
| 1. | Jeff Ray, c/o Stubbs & Leone |
| 2. | Sue Segura, c/o Stubbs & Leone |
| 3. | Bruce Williams, c/o Stubbs & Leone |
| 4. | Terry Oestreich, c/o Stubbs & Leone |
| 5. | Tori Willits, c/o Stubbs & Leone |
| 6. | Glenn Harris, c/o Stubbs & Leone |
| 7. | Yvonne Bales, c/o Stubbs & Leone |
| 8. | Howard Hughes, c/o Stubbs & Leone |
| 9. | Jerry Thomas, c/o Stubbs & Leone |
| 10. | Tim Gallagher, c/o Stubbs & Leone |
| 11. | Danielle DeBoever, c/o Stubbs & Leone |
| 12. | Mike Woodlee, c/o Stubbs & Leone |
| 13. | Tom Goss, c/o Stubbs & Leone |
| 14. | Ann Clemens, c/o Stubbs & Leone |
| 15. | Greg Hagwood Plumas County Sheriff's Office, 1400 East Main Street, Quincy, CA 95917 |
| 16. | Jerald Clinton Eaglesmith |
| 17. | Piers Strailey, P.O. Box 3012, Quincy, California 95971 |
| 18. | Faith Strailey, P.O. Box 3012, Quincy, California 95971 |
| 19. | Emily LaMoe, Minasian, Spruance, Meith, Soares & Sexton LLP, 1681 Bird Street, P.O. Box 1679, Oroville, CA 95965 |

| | DEFENDANTS' TRIAL WITNESS LIST FOR THE CLAIMS BROUGHT BY PLAINTIFF J.C. EAGLESMITH: |
|---|---|
| 20. | Peter Haberfeld, Siegel & Yee, 499 14th St., Suite 220, Oakland, CA 94612 |
| 21. | Paula Buus, 68 Meadow Ln., Quincy, CA 95971 |
| 22. | Becky Grant, 2312 Chandler Rd., Quincy, CA 95971 |
| 23. | Julie Hatzell, P.O. Box 58, Meadow Valley CA 95956 |
| 24. | Lesley Froggatt, P.O. Box 3852, Quincy, CA |
| 25. | Ron Collins, P.O. Box 30003, Cromberg, CA |
| 26. | Mike Higginson PCTA representative, 50 Church St., Quincy, CA |
| 27. | Ronald Taylor, Feather River College, 570 Golden Eagle Avenue, Quincy, CA 95971 |
| 28. | Jamie Cannon, Feather River College, 570 Golden Eagle Avenue, Quincy, CA 95971 |
| 29. | Ross Morgan, M.D., The Northfork Family Medicine, 1060 Valley View Drive, Qunicy, CA 94571 |
| 30. | Laura Morrison, Morrison Psycho Therapy, 7597 Highway 89, Suite 4, Graeagle, CA |
| 31. | Kim Retallac, c/o Stubbs & Leone |
| 32. | Mary Beth McLeod and/or representative of the Office of Civil Rights, U.S. Department of Education |
| 33. | Somari Thunder and/or representative of the Department of Fair Employment and Housing |
| | RETAINED EXPERTS |
| 34. | Andrew James Jolievette, Ph.D., 1600 Holoway Avenue, San Francisco, California 94132 |
| 35. | Patrick M. Delangis, CPA/CFF, CFE, CFFA, Ueltzen & Company, LLP, 3600 American River Drive, Suite 150, Sacramento, California 95864 |

| 36. | Jeffrey Gould, M.D., 350 Parnassus Avenue, Suite 309, San Francisco, California |
|-----|----------------------------------------------------------------------------------|

| DEFENDANTS' TRIAL WITNESS LIST FOR THE CLAIMS BROUGHT BY PLAINTIFF EILEEN COX: | |
|------|----------------------------------------------------------------------------|
| 1. | Sue Segura, c/o Stubbs & Leone |
| 2. | Bruce Williams, c/o Stubbs & Leone |
| 3. | Terry Oestreich, c/o Stubbs & Leone |
| 4. | Tori Willits, c/o Stubbs & Leone |
| 5. | Glenn Harris, c/o Stubbs & Leone |
| 6. | Danielle DeBoever, c/o Stubbs & Leone |
| 7. | Ann Clemens, c/o Stubbs & Leone |
| 8. | Eileen Cox |
| 9. | Kathleen Hughes, Plumas District Hospital Clinic, 1060 Valley View Drive, Quincy, CA 95971 |
| 10. | Piers Strailey, P.O. Box 3012, Quincy, California 95971 |
| 11. | Faith Strailey, P.O. Box 3012, Quincy, California 95971 |
| 12. | Lawrence Price, M.D., Quincy Family Medicine, 1045 Bucks Lake Road, Quincy, CA 95971 |
| RETAINED EXPERTS | |
| 13. | Patrick M. Delangis, CPA/CFF, CFE, CFFA, Ueltzen & Company, LLP, 3600 American River Drive, Suite 150, Sacramento, California 95864 |
| 14. | Jeffrey Gould, M.D., 350 Parnassus Avenue, Suite 309, San Francisco, California |

*Defendants reserve the right to identify any witness identified by any Plaintiff.

**EXHIBIT C**

1  DAN SIEGEL, SBN 56400
   PETER HABERFELD, SBN 41723
2  MICHAEL SIEGEL, SBN 269439
3  SIEGEL & YEE
   499 14th Street, Suite 300
4  Oakland, CA  94612
   Telephone: (510) 839-1200
5  Facsimile: (510) 444-6698

6
   Attorneys for Plaintiffs
7  JERALD CLINTON (J.C.) EAGLESMITH,
   and EILEEN COX
8

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12  JERALD CLINTON (J.C.) EAGLESMITH, )   Case No. 2:11-CV-00098-JAM-JFM
    and EILEEN COX,                   )
13                                    )   PLAINTIFFS' EXHIBIT LIST
14              Plaintiffs,           )
          vs.                         )   EXHIBIT C
15                                    )
    JEFF RAY, as an individual, SUE   )
16  SEGURA, as an individual, and BOARD )
17  OF TRUSTEES OF PLUMAS COUNTY      )
    OFFICE OF EDUCATION/ PLUMAS       )
18  COUNTY UNIFIED SCHOOL DISTRICT,   )
                                      )
19              Defendants.           )
20  _____ )

21

22      Plaintiffs J.C. Eaglesmith and Eileen Cox may introduce the following exhibits at

23  trial in this case:

24      1.    Eaglesmith letter to Segura, 6/1/09 (Eaglesmith 854)

25      2.    Eaglesmith email to Segura, 8/25/09 (Eaglesmith 855)

26      3.    PUSD Maintenance Department work order, issued 8/27/09 (DEF 3297)

27      4.    Eaglesmith email to Ray, 9/16/09 (Eaglesmith 862)

28      5.    PUSD Coach Hiring Flowchart (DEF 3256)

_____
*Eaglesmith v. Ray*, Case No.2:11-CV-00098-JAM-JFM
Plaintiffs' Exhibit List - 1

6.  Segura email to Eaglesmith, Hughes, Ray, 9/21/09 (Eaglesmith 863)

7.  Segura email to Eaglesmith, 10/23/09 (DEF 1937-1939)

8.  Ray email to Shipp, 11/6/09 (DEF 2003)

9.  Eaglesmith memo to Segura, Ray, 12/19/09 (DEF 1895-1896)

10. Eaglesmith memo to Harris with support letters, 1/13/10 (DEF 581-597AA, 601)

11. PUSD Coach's Evaluation for Eaglesmith, 5/3/10 (DEF 2037)

12. Interview records for QHS Head Basketball Coach, 8/31/10 (DEF 995-1004)

13. Hughes email to Segura, 1/29/10 (DEF 1824-1825)

14. Barnes note regarding Segura's Mr. Ass-hole Smith remark, 2/26/10 (Barnes 13)

15. PUSD Evaluation for Cox, 1/25/10 (Cox 1-2)

16. QHS/Footloose Dance team proposal, 8/30/10 (Cox 95)

17. PUSD Improvement Record for Cox, 4/21/11 (DEF 2097-2106)

18. PUSD Improvement Record for Cox, 1/31/11 (Cox 47-48)

19. Eaglesmith memo to Gallagher, Ray, Hood, Hughes, 2/10/05 (Eaglesmith 659-660)

20. Bulletin article, Thanksgiving a different view, 11/29/06 (Eaglesmith 671-673)

21. PUSD District Complaint by Eaglesmith, 1/23/07 (Eaglesmith 682-684)

22. Baker letter to Eaglesmith, 5/30/07 (DEF 773)

23. QHS Coaches' Handbook 2008-2009 cover and page 4 (Eaglesmith 478, 483)

24. Hughes email to Eaglesmith, Ray, 10/23/09 (DEF 1827-1829)

25. Eaglesmith memo to Hughes, 10/23/09 (DEF 1826)

26. Letter signed by Segura, Eaglesmith, Hughes, 11/3/09 (DEF 1884)

27. Ray email to Shipp, 11/6/09 (DEF 2000)

28. Hughes email to Segura, 1/7/10 (DEF 1931)

29. Hughes email to Ray, 2/6/10 (DEF 1874)

30. Hughes email to Segura, 1/23/10 (1812-1813)

31. PUSD/PCTA Mediated Agreement, 7/3/07 (DEF 220)

32. DFEH letter to Eaglesmith, 8/15/08 (Eaglesmith 1461-1462)

33. PUSD Coach's Evaluation for Eaglesmith, 5/26/06 (Eaglesmith 835-836)

34. PUSD Coach's Evaluation for Eaglesmith, 5/29/07 (Eaglesmith 798-800)

35. Williams appointment letter to Eaglesmith, 12/8/09 (DEF 1217)

36. QHS Coaches' Handbook page 5, Job Description: Athletic Program Head Coach (Varsity) (Eaglesmith 484)

37. Eaglesmith memo to Williams regarding Collins complaint, 3/10/10 (DEF 705)

38. P. Strailey, Eaglesmith letter to Harris, 5/24/10 (DEF 706-707)

39. Segura memo to Cox, 7/1/10 (DEF 40)

40. PUSD Voluntary Resolution Plan regarding OCR complaint, 10/10/96 (Eaglesmith 1909-1915)

41. PUSD AR 4114(a), Personnel: Complaints by Employees (DEF 4632)

42. PUSD AR 4030(a), Personnel: Nondiscrimination in Employment (DEF 4633)

43. PUSD AR 4030, Personnel: Nondiscrimination in Employment (DEF 4634)

44. Cox complaint to Harris, 1/16/11 (DEF 933-934)

45. Plumas County Grand Jury Report, 2010-2011 (DEF 5334-5347)

46. PUSD Application and Permit for Use of School District Property, 6/10/10 (DEF 3518)

47. Eaglesmith Incident Report to Oestreich, 11/3/10 (DEF 317, Eaglesmith 7, 4-6)

48. Oestreich Warning of Unprofessional Conduct to Eaglesmith, 10/27/10 (Eaglesmith 1226-1227)

49. Oestreich Letter of Reprimand to Eaglesmith, 12/2/10 (Eaglesmith 1301-1302)

50. Oestreich Withdrawal of Letter of Reprimand to Eaglesmith, 12/16/10 (DEF 864-864-A)

51. Oestreich signed statement regarding theft accusation, 1/6/10 (Eaglesmith 1010)

52. PUSD GP-1 regarding hate truck, 11/19/10 (Eaglesmith 1290-1292)

53. PUSD GP-2 regarding Cox layoff, 11/23/10 (DEF 4492)

54. PUSD Improvement Record for Cox, 2/1/10 (DEF 1560-1561)

55. PUSD District Complaint by P. Strailey, 11/5/10 (DEF 815-817)

56. PUSD District Complaint by Cox, 11/8/10 (DEF 4430-4434)

57. QHS/Footloose revised Dance team proposal, 8/30/10 (DEF 3679)

58. PUSD District Complaint by Ron Collins, 2/22/10 (Eaglesmith 1062-1064)

59. Williams email to M. Holcomb, 5/8/03 (Eaglesmith 2165)

60. Segura fax to Harris, 2/23/10 (DEF 1839-1841)

61. Williams appointment letter to Hughes, 12/28/09 (DEF 3538)

62. Hughes email to Ray, 8/24/10 (DEF 4111-4112)

63. Ray notes regarding meeting with Collins, 2/23/10 (DEF 4655)

64. Caleb Collins signed statement, 3/2/10 (DEF 1845)

65. Greenville Junior H.S. Basketball 2011-2012 season record (Eaglesmith 2237-2240)

66. PCTA Bilateral Agreement, Section 9.10 (DEF3206-3207)

67. PUSD Administrative Regulation 4118: Suspension Disciplinary Action (DEF3203-3205)

68. PUSD Board Policy 4030(a): Nondiscrimination in Employment

69. United States Department of Education Office for Civil Rights letter to W. Hyman, 11/27/96 (Eaglesmith 1916-1924)

70. J. Potillor support letter, 2/1/07 (Eaglesmith 694)

1    71.    L. Butler support letter, 2/1/07 (Eaglesmith 693)

2    72.    Richard Zunino support letter (DEF 2218)

3    73.    M. Prewitt support letter, 2/2/07 (DEF 2222)

4    74.    H. Williams letter, 2/7/07 (DEF 4594-4595)

5    75.    C. Sherrard letter, 2/7/07 (DEF 2227)

6    76.    S. King incident report, 2/7/07 (DEF 2228)

7    77.    J. Kimmel support letter (DEF 537)

8    78.    R. Drybread support letter (DEF 538)

9    79.    D.W. Jackson support letter (DEF 586)

10    80.    McColm support letter, 2/12/07 (Eaglesmith 713)

11    81.    M. Nesbit support letter, 2/12/07 (DEF 2221)

12    82.    PUSD GP-1 regarding Eaglesmith discrimination, 2/13/07 (Eaglesmith 732-733)

83.    PUSD GP-2 regarding Eaglesmith discrimination, 2/14/07 (Eaglesmith 734)

84.    R. Wade support letter, 2/22/07 (DEF 533)

85.    S. King support letter (DEF 536)

86.    PUSD GP-3 regarding Eaglesmith discrimination, 3/6/07 (Eaglesmith 735-736)

87.    PUSD GP-4 regarding Eaglesmith discrimination, 3/7/07 (Eaglesmith 737)

88.    H. Williams support letter, 3/15/07 (DEF 534)

89.    PUSD GP-5 regarding Eaglesmith discrimination, 3/19/07 (Eaglesmith 738-743)

90.    S. Roberts letter, 3/22/07 (DEF 693)

91.    R. Turcotte support letter, 3/22/07 (DEF 679)

92.    J. Potillor letter to Gallagher, 3/26/07 (DEF 539)

93.    J. Abell support letter, 3/26/07 (DEF 692-A)

94. Robbins support letter, 3/28/07 (Eaglesmith 753)

95. Eaglesmith memo to Chelotti, 8/7/07 (DEF 2305)

96. Eaglesmith resignation letter, 9/4/07 (DEF 410)

97. Eaglesmith email to Chelotti, 9/25/07 (Eaglesmith 821)

98. Eaglesmith DFEH charge, 10/8/07 (DEF 351-352)

99. PUSD Coach's Evaluation for Eaglesmith, 3/19/09 (Eaglesmith 834)

100. Hughes letter of intent to return, 4/2/09 (DEF 3539)

101. Eaglesmith memo to Gallagher, 5/5/09 (DEF 2308)

102. Eaglesmith email to Gallagher, 5/12/09 (Eaglesmith 852)

103. Eaglesmith email to Ray, 9/10/09 (Eaglesmith 861)

104. Eaglesmith memo to Segura, Ray, 10/26/09 (DEF 1817-1818)

105. Eaglesmith CPS report, 12/17/09 (Eaglesmith 981-985)

106. Eaglesmith incident report to Segura, 2/5/10 (DEF 1872)

107. Segura memo to Eaglesmith, 5/14/10 (DEF 237)

108. PUSD GP-1 regarding Eaglesmith evaluation, 5/14/10 (Eaglesmith 1088-1091)

109. PUSD GP-2 regarding Eaglesmith evaluation, 5/21/10 (Eaglesmith 1092)

110. PUSD Feather River Bulletin advertisement, 5/19/10 (Eaglesmith 1099)

111. Eaglesmith letter to Williams, 5/20/10 (Eaglesmith 1113)

112. Williams Warning memo to Eaglesmith, 5/20/10 (DEF 708)

113. PUSD GP-3 regarding Eaglesmith evaluation, 5/24/10 (Eaglesmith 1093-1095)

113. PUSD Feather River Bulletin advertisement, 5/26/10 (Eaglesmith 1126)

115. Eaglesmith memo to Williams, 6/3/10 (Eaglesmith 1134)

116. PUSD GP-4 regarding Eaglesmith evaluation, 6/8/10 (Eaglesmith 1096)

117. PUSD Feather River Bulletin advertisement, 6/9/10 (Eaglesmith 1138)

118. Segura, Ray memo to Eaglesmith, 6/22/10 (Eaglesmith 1142)

119. Williams memo to P. Strailey, 6/29/10 (DEF 245)

120. PUSD GP-6 regarding Eaglesmith evaluation, 7/8/10 (Eaglesmith 1144)

121. Hughes email to Ray, 8/24/10 (DEF 4112-4113)

122. Ray letter to Eaglesmith, 8/27/10 (Eaglesmith 1148)

123. Ray letter to Eaglesmith, 9/1/10 (Eaglesmith 1149)

124. Hughes email to Ray, 9/7/10 (DEF 4092-4096)

125. Eaglesmith informal grievance, 10/28/10 (Eaglesmith 1228)

126. Cox Grievance Form-Bilateral Agreement, 11/8/10 (DEF 950-955)

127. Harris letter to Cox, 11/10/10 (Cox 26-28)

128. Cox DFEH charge, 12/29/10 (Cox 157)

129. Elizabeth Dutton support letter, 1/31/11 (DEF 2172)

130. Donna Waller support letter, 2/4/11 (DEF 2057)

131. Segura email to Ray, 2/9/11 (DEF 3986)

132. Para professional expectations at QHS, 2/11 (DEF 2055)

133. F. Strailey support letter, 2/12/11 (Cox 56)

134. P. Strailey support letter, 2/13/11 (Cox 58-60)

135. Segura memo to Cox, 3/7/11 (DEF 2054)

136. PUSD Improvement Record for Cox, 1/4/12 (Cox 266-267)

137. PUSD Improvement Record for Cox, 1/5/12 (Cox 268-269)

138. PUSD Improvement Record for Cox, 1/31/12 (Cox 270-271)

139. PUSD Coach Evaluation for Eaglesmith, 6/11/12 (Eaglesmith 2235-2236)

140. Indian Valley Record, Native Americans honored photograph, 12/5/12 (Eaglesmith 2245)

141. PUSD Coach Evaluation for Eaglesmith, 2/12/13 (Eaglesmith 2237-2238)

142. Eaglesmith letter of intent to G. Miller, 2/28/13 (Eaglesmith 2239-2244)

143. Copy of Greenville Jr. High School Boy's Basketball banner (Eaglesmith 2246)

144. Harris letters to Board of Education, 8/23/09-1/28/11 (DEF 5279-5303, 4908-4912, 5304-5305, 5309-5311, 5316)

145. Harris letters to Board of Education, 3/11/11-4/22/11 (DEF 5321-5323, 5326-5327, 5317-5318)

146. PUSD Board Policy 1312.1: Complaints Concerning District Employees (DEF 3220-3221)

147. PUSD Administrative Regulation 1312.1: Complaints Concerning District Employees (DEF 3222-3225)

148. PUSD Board Policy 1312.3: Uniform Complaint Procedures (DEF 3232-3234)

149. PUSD Administrative Regulation 1312.3: Uniform Complaint Procedures (DEF 3235-3241)

150. PUSD Administrative Regulation 3541.1: Transportation for School-Related Trips (DEF 5378-5380)

151. PUSD Board Policy 4030: Nondiscrimination in Employment (DEF 358-360)

152. PUSD Board Policy 4127: Temporary Athletic Team Coaches (DEF 3250-3251)

153. PUSD Board Policy 4119.22: Dress and Grooming (DEF 5365-5366)

154. PUSD Board Policy 4119.22, 4219.22, 4319.22: Dress and Grooming (DEF 3212)

155. PUSD Board Policy 5132: Dress (DEF 3218-3219)

156. Negotiated Certificated Agreement PUSD/PCOE and Plumas CTA, 7/1/09-6/30/11 (Eaglesmith 1614-1717)

157. Arbitration Opinion and Award in the matter of Arbitration between Eaglesmith and PUSD, 1/25/12

158. Plumas Rural Health Center medical bills for Eaglesmith (Eaglesmith 599-606)

159. Morrison's Psychotherapy patient ledger for Eaglesmith (Eaglesmith 615)

160. Plumas Rural Health Center medical bills for Cox (Cox 116-120; to be updated)

161. Plumas Rural Health Center psychotherapy bills for Cox (Cox 121-258; to

1    be updated)

2    162.   Margo Ogus chart regarding J.C. Eaglesmith's economic loss.

3    163.   Photograph of Eaglesmith in hat and glasses (Eaglesmith 1721)

4    164.   Photograph of Eaglesmith addressing QHS assembly, 11/21/06
5            (Eaglesmith 1725)

6    165.   Photograph of Eaglesmith aka Chebon Tenitkee (Thunder Boy)
7            (Eaglesmith 38)

8    166.   Photograph of Eaglesmith children (Eaglesmith 39)

9    167.   Photograph of Eaglesmith coaching basketball team (Eaglesmith 26)

10   168.   Photograph of K. Triance wearing visor cap at staff meeting (Eaglesmith
11          12)

12   169.   Photograph of the hate truck tailgate (Eaglesmith 6)

13   170.   Photograph of the hate truck front windshield (Eaglesmith 7)

14   171.   Photograph of the hate truck (Eaglesmith 9)

15   172.   Photograph of the hate truck front bumper (Eaglesmith 2231)

16   173.   Photograph of the toilet room (Barnes 287)

17   174.   Photograph of the toilet room (Barnes 288)

18   175.   Photograph of the Inner office (Barnes 290)

19   176.   Photograph of the Inner office (Barnes 299)

20   177.   Photograph of the Inner office (Barnes 300)

21   178.   Photograph of the Inner office lockers and bench (Barnes 312)

22   179.   Photograph of the pneumatic pump (Barnes 302)

23   180.   Photograph of gift giving ceremony at QHS (Eaglesmith 2247)

24   181.   Photograph of the War Dance performed at QHS (Eaglesmith 2248)

25   Dated: March 15, 2013                    SIEGEL & YEE

26

27                                           By /s/Peter Haberfeld
                                                Peter Haberfeld

28                                           Attorneys for Plaintiffs

**EXHIBIT D**

# EXHIBIT D

<table>
<tr><th colspan="3">DEFENDANTS' EXHIBIT LIST FOR THE TRIAL OF CLAIMS BY<br>PLAINTIFF J.C.  EAGLESMITH</th></tr>
<tr><th>Exhibit<br>Number</th><th>Document Description</th><th>Bates<br>Number/Range</th></tr>
<tr><td>Exhibit 200</td><td>March 30 Handwritten note by Sue Segura regarding Mr. Collins</td><td>DEF 001865</td></tr>
<tr><td>Exhibit 201</td><td>04/02/10 E-mail from Sue Segura to Glenn Harris; Subject: Investigation (seatbelt issue)</td><td>DEF 001836</td></tr>
<tr><td>Exhibit 202</td><td>03/09/10 Fax Transmittal Form from Sue Segura to Bruce Williams (attaching students' handwritten statements)</td><td>DEF 001842-1847</td></tr>
<tr><td>Exhibit 203<br>Confidential</td><td>04/25/11 PUSD Coach's Evaluation – Mike Woodlee</td><td>DEF 003878</td></tr>
<tr><td>Exhibit 204</td><td>10/26/09 Memorandum from J.C. Eaglesmith to Sue Segura & Jeff Ray; RE: QHS Boys Basketball Program Building: A Collaborative Model vs. Divisive Elitism</td><td>DEF 001817-1818</td></tr>
<tr><td>Exhibit 205</td><td>01/05/10 E-mail from Howard Hughes to Jeff Ray; Subject: Language</td><td>DEF 001910</td></tr>
<tr><td>Exhibit 206</td><td>05/11/10 Memorandum from J.C. Eaglesmith to Sue Segura & Jeff Ray; Re: Response – "Coach's Evaluation"</td><td>DEF 002036</td></tr>
<tr><td>Exhibit 207</td><td>03/13/07 PUSD District Complaint Form from Paula Buus about J.C. Eaglesmith as coach</td><td>DEF 000644-647</td></tr>
<tr><td>Exhibit 208</td><td>03/12/07 PUSD District Complaint form by Becky Grant about J.C. as coach</td><td>DEF 002259-2264</td></tr>
<tr><td>Exhibit 209</td><td>03/12/07 PUSD District Complaint form by Lesley Froggatt about J.C. Eaglesmith as coach</td><td>DEF 002256-2258</td></tr>
<tr><td>Exhibit 210</td><td>04/28/10 Memo from Bruce Williams to Glenn Harris; Re: Follow-up report on Eaglesmith Investigation</td><td>DEF 000737-739</td></tr>
</table>

## DEFENDANTS' EXHIBIT LIST FOR THE TRIAL OF CLAIMS BY PLAINTIFF J.C. EAGLESMITH

| Exhibit Number | Document Description | Bates Number/Range |
|---|---|---|
| Exhibit 211 | 10/01/10 Letter from Glenn Harris to J.C. Eaglesmith regarding request to be placed on the October 12, 2010 Governing Board meeting agenda | Eaglesmith 1165 |
| Exhibit 212 | 10/06/10 Letter from Lesley Beth Curtis and Joshua Kob to Glenn Harris; Re: J.C. Eaglesmith, CTA No. 62301 | DEF 000634-636 |
| Exhibit 213 | 10/11/10 Letter from Lesley Beth Curtis to Michelle Cannon; Re: J.C. Eaglesmith, CTA No. 63201 | DEF 004302-4306 |
| Exhibit 214 | 11/15/10 Letter from Glenn Harris to Linda Satchell regarding truck bearing offensive messages | DEF 000854 |
| Exhibit 215 | 12/17/10 & 01/04/11 E-mail from Glenn Harris to All Staff attaching December 17, 2010 Memo from Glenn Harris to Staff; Re: Leadership | Eaglesmith 1346-1348 |
| Exhibit 216 | 12/16/10 E-mail from Yvonne Bales to Terry Oestreich, Tori Williams, Bruce Williams, Ken Capistrand, Becky Mills, Ken Pierson, Scott Cory, Sally McGowan, James Lake, Brian Johnson, Sue Segura, Edeltraud Dilger-Marquette, Kristy Warren; Subject: Personal Statement from Yvonne | DEF 004787-4879 |
| Exhibit 217 | 10/12/10 Memo from Terry Oestreich to Bruce Williams; Re: Summary of Incidence on October 11, 2010 with Mr. Eaglesmith | DEF 000052-53 |
| Exhibit 218 | 10/12/10 Memo from Terry Oestreich to J.C. Eaglesmith; Subject: Warning of Unsatisfactory Performance | DEF 000056 |
| Exhibit 219 | 12/15/10 Letter from Terry Oestreich to J.C. Eaglesmith; Re: Physicians Verification | DEF 000894 |
| Exhibit 220 | 12/15/10 Letter from Terry Oestreich to Piers Strailey; Re: 1312 – Citizen's Complaint against PUSD Employees Dated November 15, 2010 regarding pickup truck | DEF 000804-805 |

## DEFENDANTS' EXHIBIT LIST FOR THE TRIAL OF CLAIMS BY PLAINTIFF J.C. EAGLESMITH

| Exhibit Number | Document Description | Bates Number/Range |
|---|---|---|
| Exhibit 221 | 08/09/11 Memo from Bruce Williams to Owner/Director Footloose Dance Studio; Re: Use of School Facilities Request Form | Cox 257-265 |
| Exhibit 222 | 10/14/10 Typewritten statement by Tori Willits documenting issue of J.C. Eaglesmith wearing ball cap and dark sunglasses during staff welcome address | DEF 000919 |
| Exhibit 223 | 10/18/10 E-mail from J.C. Eaglesmith to Tori Willits regarding Willits Proposed Meeting 10/19/10 | Eaglesmith 1210 |
| Exhibit 224 | 03/10/10 Memo from J.C. Eaglesmith to Bruce Williams; Re: Complaint of 2/22/10 – Mr. Ron Collins | Eaglesmith 1069-1070 |
| Exhibit 225 | 03/23/10 Memo from Bruce Williams to J.C. Eaglesmith; Re: Warning (regarding seatbelt issue) | Eaglesmith 1121 |
| Exhibit 226 | 01/06/10 Summary by J.C. Eaglesmith of August 21, 2009 meeting between J.C. Eaglesmith and Terry Oestreich | DEF 000602 |
| Exhibit 227 | 03/23/10 Memo from Bruce Williams to Sue Segura; Re: Administrative Regulation 6153 (seatbelt issue) | DEF 001848-1852 |
| Exhibit 228 | 03/02/10 Student statement regarding seatbelt issue | DEF 001845 |
| Exhibit 229 | 04/02/10, 04/20/10, & 04/22/10 Students' statements regarding seatbelt issue | DEF 000728-736 |
| Exhibit 230 | Undated report by Bruce Williams regarding the February 23, 2010 complaint by Ron Collins (regarding the seatbelt issue) | DEF 01853-1854 |
| Exhibit 231 | 01/07/10 E-mail from Mike Higginson to Faith Strailey; Subject: Re: J.C. Continued | Eaglesmith 1011 |
| Exhibit 232 | 01/05/10 Letter from Jeff Ray to Quincy High Basketball Parents concerning sportsman-like behavior | DEF004676 |

## DEFENDANTS' EXHIBIT LIST FOR THE TRIAL OF CLAIMS BY PLAINTIFF J.C. EAGLESMITH

| Exhibit Number | Document Description | Bates Number/Range |
|---|---|---|
| Exhibit 233 | 01/19/11 Letter from Christopher Russell to J.C. Eaglesmith; Re: Complaint of Harassment/Discrimination | DEF 004792 |
| Exhibit 234 | 12/02/10 Letter from Terry Oestreich to J.C. Eaglesmith; Subject: Letter of Reprimand | DEF 000865-866 |
| Exhibit 235 | Undated Black & White photograph depicting inner office | Eaglesmith 23 |
| Exhibit 236 | 03/07/07 Letter from J.C. Eaglesmith To Whom It May Concern; Re: Feather River League Post-Season Meeting | DEF 004607 |
| Exhibit 237 | 11/23/09 E-mails between J.C. Eaglesmith and Howard Hughes; Subject: Program Progress/Player Evals | DEF 000598 |
| Exhibit 238 | 12/10/09 & 12/14/09 E-mails between J.C. Eaglesmith, Sue Segura, and Howard Hughes; Subject: Complaint Letter – JV Basketball | Eaglesmith 966 |
| Exhibit 239 | 01/04/10 & 01/05/10 E-mails between Howard Hughes, Sue Segura, J.C. Eaglesmith; Subject: Re: Boys JV Practice | DEF 001907-1909 |
| Exhibit 240 | 01/27/10 E-mails between Howard Hughes and Sue Segura; Subject: Basketballs | DEF 001816 |
| Exhibit 241 | 02/02/10 Memorandum from J.C. Eaglesmith to Howard Hughes; Re: Program Cohesiveness/Continuity for QHS Boys Basketball | Eaglesmith 1054 |
| Exhibit 242 | 10/18/10 Letter from J.C. Eaglesmith to Dr. Ross Morgan, M.D. regarding alleged harassment and discrimination toward J.C. Eaglesmith, his wife and his son | Un-numbered |

### DEFENDANTS' EXHIBIT LIST FOR THE TRIAL OF CLAIMS BY PLAINTIFF J.C. EAGLESMITH

| Exhibit Number | Document Description | Bates Number/Range |
|---|---|---|
| Exhibit 243 | 10/2010 Typewritten document authored by J.C. Eaglesmith titled "Least we forget the Big Picture" provided as background information to Dr. Laura Morrison, Ph.D. | Un-numbered |
| Exhibit 244 | Typewritten document titled "Statement by Ron Collins concerning his complaint, received on 2/23/10 | DEF 000719 |
| Exhibit 245 | 12/14/10 PUSD Regular Meeting of the Governing Board minutes | Un-numbered |
| Exhibit 246 | Photographs of District office and parking lot | Un-numbered |
| Exhibit 247 | 04/03/12 Report by Dr. Andrew Jolivette, Ph.D. | Un-numbered |
| Exhibit 248 | 04/06/12 Report of Patrick M. DeLangis, CPA/CFF, DVE, CFFA (redacted as to former plaintiffs Ramona Eaglesmith and Bruce Barnes) | Un-numbered |
| Exhibit 249 | 05/17/12 Report by Dr. Jeff Gould, M.D., Inc. regarding J.C. Eaglesmith | Un-numbered |
| Exhibit 250 | 04/18/12 Raw Data / Test Results of Dr. Jeff Gould, M.D., Inc. regarding J.C. Eaglesmith | Un-numbered |
| Exhibit 251 | 02/01/07 Response by Tim Gallagher to complaint filed by J.C. Eaglesmith | DEF 000750-751 |
| Exhibit 252 | 01/06/11 Confidential Investigation Report by Emily E. LaMoe Re: Allegations Made by J.C. Eaglesmith in October 11, 2010 Letter | DEF 000827-834 |
| Exhibit 253 | PCTA CBA Section 11-Wages | Un-numbered |
| Exhibit 254 | Picture of J.C. Eaglesmith's hat | Eaglesmith 1719 |

## DEFENDANTS' EXHIBIT LIST FOR THE TRIAL OF CLAIMS BY PLAINTIFF J.C. EAGLESMITH

| Exhibit Number | Document Description | Bates Number/Range |
|---|---|---|
| Exhibit 255 | 06/05/92 Complaint letter from J.C. Eaglesmith to Jack Ward, Superintendent, Mendocino County Office of Education | 10 |
| Exhibit 256 | 12/12/91 Complaint for Declaratory and Injunctive Relief and For Damages by J.C. Eaglesmith / Mendocino County Indian Center to Jack Ward, Mendocino County Superintendent of Schools, et al. | Un-numbered |
| Exhibit 257 | 10/29/92 First Amended for Declaratory and Injunctive Relief and For Damages by J.C. Eaglesmith / Mendocino County Indian Center to Jack Ward, Mendocino County Superintendent of Schools, et al. | Un-numbered |
| Exhibit 258 | 05/07/90 Complaint (Jury Demand) by J.C. Eaglesmith, et al. to Boy Scouts of America, et al. | Un-numbered |
| Exhibit 259 | 01/31/91 First Amended Complaint (Jury Demand) by J.C. Eaglesmith, et al. to Boy Scouts of America, et al. | Un-numbered |
| Exhibit 260 | 10/11/01 Letter from Alphas B. Scoggins, Team Leader, United States Department of Education Office For Civil Rights to Dennis Williams, Superintendent, Plumas Unified School District regarding discrimination complaint filed by Willie J. Hymen of the Butte Community Coalition | Un-numbered |
| Exhibit 261 | Subpoena to Custodian of Records for Feather River Community College, dated March 2, 2012 | Un-numbered |

## DEFENDANTS' EXHIBIT LIST FOR THE TRIAL OF CLAIMS BY
## PLAINTIFF J.C. EAGLESMITH

| Exhibit Number | Document Description | Bates Number/Range |
|---|---|---|
| Exhibit 262 | Affidavit of David Burris of Feather River Community College | 1 |
| Exhibit 263 | Feather River Community College District Application for voluntary services by J.C. Eaglesmith dated July 21, 2010 | 3 |
| Exhibit 264 | Email from J.C. Eaglesmith to Ronald Taylor, dated January 11, 2011 | 5 |
| Exhibit 265 | Email from J.C. Eaglesmith to Ronald Taylor, dated January 22, 2011 | 9-10 |
| Exhibit 266 | Letter from Ron Taylor, PhD to J.C. Eaglesmith, dated January 25, 2011 | 6-8 |
| Exhibit 267 | Email from J.C. Eaglesmith to Ronald Taylor, dated January 28, 2011 | 11-13 |
| Exhibit 268 | Email chain between J.C. Eaglesmith and Ronald Taylor, dated March 14, 2011 | 14-15 |
| Exhibit 269 | Email chain between J.C. Eaglesmith and Ronald Taylor, dated August 23, 2011 | 16 |
| Exhibit 270 | Summary report J.C. Eaglesmith | 17 |
| Exhibit 271 | Administrative determination: Discrimination/harassment investigation (informal): J.C. Eaglesmith, September 11, 2011 | 18-21 |
| Exhibit 272 | Informal report: Discrimination/harassment investigation: J.C. Eaglesmtih, September 11, 2011 | 22-30 |

## DEFENDANTS' EXHIBIT LIST FOR THE TRIAL OF CLAIMS BY PLAINTIFF J.C. EAGLESMITH

| Exhibit Number | Document Description | Bates Number/Range |
|---|---|---|
| Exhibit 273 | Records of Ross Morgan, M.D. at the Northfork Family Medicine | 1-85 |
| Exhibit 274 | Records of Laura Morrison, Ph.D. at Morrison Psychotherapy | 1-12 |
| Exhibit 275 | Personnel file of J. C. Eaglesmith | DEF 1120-1315 |
| Exhibit 276 | J.C. Eaglesmith payroll and attendance records | Un-numbered |
| Exhibit 277 | BP 5132 Student dress code | DEF 925 |
| Exhibit 278 | Letter dated November 11, 2010 from Glen Harris to Yvonne Bales | Un-numbered |
| Exhibit 279 | Teaching credential of J.C. Eaglesmith | Un-numbered |
| Exhibit 280 | Plumas Unified School District Teacher Assigned Outside Credential Authorization, October 10, 2012 | Un-numbered |
| Exhibit 281 | Memorandum re: Authorization to Teach Outside Credential Area, September 19, 2012 | Un-numbered |
| Exhibit 282 | Job Description of Greenville Sr./Jr. High School special education position in 2011 | Un-numbered |
| Exhibit 283 | Job Description of Greenville Sr./Jr. High School opportunity class position in 2012 | Un-numbered |
| Exhibit 284 | Letter re: denial of Eaglesmith application to Greenville special education position | Un-numbered |
| Exhibit 285 | DFEH/EEOC records pertaining to J.C. Eaglesmith | Un-numbered |
| Exhibit 286 | PCTA Collective Bargaining Agreement | Un-numbered |

| \multicolumn{3}{c}{**DEFENDANTS' EXHIBIT LIST FOR THE TRIAL OF CLAIMS BY PLAINTIFF EILEEN COX**} |

| Exhibit Number | Document Description | Bates Number/Range |
|---|---|---|
| Exhibit 287 | 08/09/11 Memo from Bruce Williams to Owner/Director Footloose Dance Studio; Re: Use of School Facilities Request Form | Cox 257-265 |
| Exhibit 288 | 01/25/10 PUSD Improvement Record For Classified Employees regarding Eileen Cox for period of August 2009 to June 2010 | Cox 1-2 |
| Exhibit 289 | 12/09/10 Typewritten note from James "Andy" Crane to Eileen Cox regarding how to properly handle student assessments | DEF 002079 |
| Exhibit 290 | 08/31/10 Memo from Sue Segura to Tori Willits; Re: Summary of Meeting – Held on August 26, 2010 | DEF 002075-2076 |
| Exhibit 291 Confidential | 07/21/10 Letter from Sue Segura to Eileen Cox; Re: Keys to Quincy High School | DEF 000040 |
| Exhibit 292 | 12/09/10 Handwritten note by James A. Crane documenting interaction with Eileen Cox regarding Crane's letter about issues with Cox and vocational assessment | DEF 002104 |
| Exhibit 293 | 04/21/11 PUSD Improvement Record For Classified Employees – Eileen Cox for period 2/1/2010 to 1/31/2011 | Cox 68-69 |
| Exhibit 294 | 01/04/11 PUSD District Complaint Form from Piers Strailey regarding October 29, 2010 meeting between Eileen Cox and Sue Segura | DEF 003298-3300 |
| Exhibit 295 Confidential | 01/25/11 PUSD District Complaint Form from Alice Eileen Cox regarding alleged October 29, 2010 through January 6, 2011 retaliatory, discriminatory and illegal threats by Sue Segura | DEF 004409-4410 |

| Exhibit 296 Confidential | 08/27/10 Summary of Staff Meeting from Sue Segura to Tori Willits | DEF 004518-4519 |
|---|---|---|
| Exhibit 297 | 03/31/11 Memo from Tori Willits to David Pinson; Re: Your letter regarding Eileen Cox dated 3/18/11 but received 3/28/11 | DEF 002051 |
| Exhibit 298 Confidential | Undated, typewritten document concerning current AR 1330 regarding community use of school district facilities | DEF 004485 |
| Exhibit 299 | PUSD Individual Transition Plan forms (redacted) | Un-numbered |
| Exhibit 300 | Undated Black & White photograph depicting Room 9 of Pioneer School | Ramona Eaglesmith 1 |
| Exhibit 301 | 03/18/11 E-mail from Bruce Williams to Frank Carey; Subject: Room 9 and the dancers | DEF 004049 |
| Exhibit 302 | 04/06/12 Report of Patrick M. DeLangis, CPA/CFF, DVE, CFFA (redacted as to former plaintiffs Ramona Eaglesmith and Bruce Barnes) | Un-numbered |
| Exhibit 303 | 05/24/12 Report by Dr. Jeff Gould, M.D., Inc. regarding Eileen Cox | Un-numbered |
| Exhibit 304 | 04/24/12 Raw Data / Test Results of Dr. Jeff Gould, M.D., Inc. regarding Eileen Cox | Un-numbered |
| Exhibit 305 | Plumas County Classified Employees Association collective bargaining agreement | Un-numbered |
| Exhibit 306 | Personnel File of Eileen Cox | DEF 1316-1590 |
| Exhibit 307 | Records of Lawrence Price, M.D. at Quincy Family Medicine | 1-52 |
| Exhibit 308 | Eileen Cox payroll and attendance records | Un-numbered |
| Exhibit 309 | DFEH/EEOC records pertaining to Eileen Cox | Un-numbered |

*Defendants reserve the right to identify any exhibit identified by any Plaintiff.

**EXHIBIT E**

1  DAN SIEGEL, SBN 56400
2  PETER HABERFELD, SBN 41723
   MICHAEL SIEGEL, SBN 269439
3  SIEGEL & YEE
   499 14th Street, Suite 300
4  Oakland, CA  94612
   Telephone: (510) 839-1200
5  Facsimile: (510) 444-6698

6
   Attorneys for Plaintiffs
7  JERALD CLINTON (J.C.) EAGLESMITH
   and EILEEN COX
8

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12
   JERALD CLINTON (J.C.) EAGLESMITH )   Case No. 2:11-CV-00098-JAM-JFM
13 and EILEEN COX,                  )
                                    )   PLAINTIFFS' LIST OF DISCOVERY
14          Plaintiffs,             )   MATERIALS TO BE USED IN LIEU
        vs.                         )   OF LIVE TESTIMONY AT TRIAL
15                                  )
16 JEFF RAY, as an individual, SUE  )   EXHIBIT E
   SEGURA, as an individual, and BOARD )
17 OF TRUSTEES OF PLUMAS COUNTY     )
   OFFICE OF EDUCATION/ PLUMAS      )
18 COUNTY UNIFIED SCHOOL DISTRICT,  )
19                                  )
            Defendants.             )
20                                  )

21

22         Pursuant to Local Rule 16-281, plaintiffs J.C. Eaglesmith and Eileen Cox hereby

23 submit the following list of discovery materials to be used in lieu of live testimony at

24 trial.

25         Excerpts from the deposition of Jim Lake

26
           8:13-9:6
27
           9:15-10:22
28

_Eaglesmith v. Ray_, Case No.2:11-CV-00098-JAM-JFM
Plaintiffs' List of Discovery - 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11:9-24

12:8-13:1

13:17-14:5

14:19-15:10

18:21-19:19

20:8-14

21:22-22:21

23:8-17

24:3-5

24:18-25:6

25:22-27:9

29:11-22

30:18-31:24

32:15-34:11

34:17-35:21

37:2-38:6

40:8-42:6

80:5-14

81:23-82:10

82:25-83:11

83:16-23

83:24-84:24

85:15-86:3

86:14--87:14

1    89:4-18

2    95:6-14

3    96:15-100:3

4

5

6    Dated: March 15, 2013

7                                    SIEGEL & YEE

8

9                                    By /s/Peter Haberfeld
                                        Peter Haberfeld
10

11                                   Attorneys for Plaintiffs
                                     J.C. EAGLESMITH and
12                                   EILEEN COX

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28